*1371
 
 OPINION OF THE COURT
 

 STAPLETON, Circuit Judge:
 

 This appeal presents the issue of whether federal bankruptcy law permits a Chapter 13 debtor to cure a default on, and reinstate, a home mortgage where the bankruptcy petition is filed during a state law redemption period following foreclosure judgment and sale. The district court affirmed the bankruptcy court’s order holding that such a cure could not be effected by a Chapter 13 plan. We also affirm.
 

 I.
 

 Benny and Edith Roach owned, subject to a mortgage held by GMAC Mortgage Corporation, real property in New Jersey that was used as their principal residence. The Roaches fell behind on the mortgage payments. GMAC declared them in default and accelerated the mortgage debt pursuant to the terms of the mortgage. GMAC subsequently initiated foreclosure proceedings and obtained a foreclosure judgment. On March 17, 1986, the Roaches’ property was sold at a sheriff’s sale for $60,000 to Arthur and Geri Lutzker.
 

 The Lutzkers paid the sheriff a deposit of $13,600 on the day of the sale. Pursuant to New Jersey Rule of Court 4:65-5, the sheriff must “deliver a good and sufficient conveyance in pursuance of the sale unless a motion for the hearing of an objection to the sale is served upon him within 10 days after the sale or at any time thereafter before the delivery of the conveyance.” On March 24,1986, before the expiration of the 10-day period following the sale, the Roaches filed a petition under Chapter 13 of the Bankruptcy Code.
 

 The Chapter 13 plan proposed to cure the mortgage default by paying the arrearages over the life of the plan, reinstate the mortgage, and maintain current mortgage payments outside the plan. On May 28, 1986, over 60 days after the order for relief, the Lutzkers moved to lift the automatic stay imposed by 11 U.S.C. § 362(a) to permit the Lutzkers to pay the remainder of the foreclosure sale purchase price to the sheriff and in turn receive a conveyance of the property from the sheriff.
 

 The bankruptcy court granted the Lutzk-ers’ motion and denied confirmation of the Roaches’ plan; on initial appeal, the district court affirmed the bankruptcy court’s order. Both judges agreed that, after the sheriff’s sale, the debtors’ only interest in the mortgaged property under state law was a right of redemption. They further agreed that 11 U.S.C. § 108(b) permitted the debtors to exercise that right of redemption within 60 days of the filing of the bankruptcy petition, but that the debtors had failed to do so. Both judges also agreed that availability of 11 U.S.C. § 1322(b)’s right to cure a default was dependent on the debtors’ interest in the mortgaged property and that the debtors’ right of redemption was not a sufficient property interest to warrant relief under § 1322(b). Finally, the district court stated that this result was necessary to “avoid an irreconcilable conflict between the operation and effect of Sections 108(b) and 1322(b).” App. at 102.
 

 On appeal, the Roaches argue that: under New Jersey law, they retain property rights other than the right of redemption; the right of redemption alone is sufficient to trigger § 1322(b)’s right to cure; § 108 does not apply to a Chapter 13 case; § 362’s automatic stay extends the redemption period for the life of the plan; and that § 1322(b)’s right to cure overrides state law that restricts the debtors to a limited right of redemption.
 

 Under our view of the case, the sole relevant issue is whether 11 U.S.C. § 1322(b) evidences a congressional intent to authorize cure of a default on a home mortgage after there has been a contractual acceleration of the full mortgage debt, a foreclosure judgment, and a foreclosure sale, so long as the state law redemption
 
 *1372
 
 period has not expired.
 
 [1]
 
 Because this is an issue of law, our review is plenary.
 
 Universal Minerals, Inc. v. C.A. Hughes & Co.,
 
 669 F.2d 98, 102 (3d Cir.1981).
 

 II.
 

 A.
 

 In construing a federal statute, our task is to ascertain congressional intent. In so doing, “we look first to the statutory language and then to the legislative history if the statutory language is unclear.”
 
 Blum v. Stenson,
 
 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). We must also remain “mindful of the statute’s object and policy and must read the disputed provision in the context of the entire statute.”
 
 N.J. Transit Policemen’s Benevolent Association Local 304 v. New Jersey Transit Corp.,
 
 806 F.2d 451, 453 (3d Cir.1986).
 

 Chapter 13 of the Bankruptcy Code allows an individual bankrupt to reorganize his or her affairs without a liquidation of assets in much the same way as Chapter 11 accords that right to businesses. Its purpose “is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period” of from three to five years. H.R.Rep. 595, 95th Cong., 1st Sess. 118 (1977), U.S.Code Cong. & AdmimNews 1978, pp. 5787, 6079,
 
 reprinted in
 
 L. King,
 
 Collier on Bankruptcy
 
 App. 2 (1987) (hereinafter
 
 Collier).
 
 Congress believed that Chapter 13 would benefit debtors by permitting a debtor to “retain his property by agreeing to repay his creditors” and to “avoid the stigma attached to straight bankruptcy,” and would benefit creditors because “their losses will be significantly less than if their debtors opt for straight bankruptcy.”
 
 Id. Accord
 
 S.Rep. 989, 95th Cong., 2d Sess. 118 (1978), U.S.Code Cong. & Admin.News 1978, p. 6079,
 
 reprinted in Collier
 
 App. 3.
 

 In relevant part, 11 U.S.C. § 1322(b) provides that a Chapter 13 plan may:
 

 (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor’s principal residence
 

 (3) provide for the curing or waiving of any default; ...
 

 (5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; ...
 

 Since the enactment of § 1322(b) in 1978, courts have frequently been called upon to determine the point at which Congress intended the right to cure a default on a home mortgage in a Chapter 13 plan to terminate: at the time of contractual acceleration; upon entry of a foreclosure judgment; at the time of a foreclosure sale; or upon expiration of the redemption period?
 
 See In re Glenn,
 
 760 F.2d 1428, 1432 (6th
 
 *1373
 
 Cir.) (discussing cases),
 
 cert. denied,
 
 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). Thus far, each court of appeals that has decided whether a home mortgage default may be cured after contractual acceleration of the full mortgage debt has provided an affirmative answer.
 
 In re Glenn,
 
 760 F.2d 1428 (6th Cir.),
 
 cert. denied,
 
 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985);
 
 In re Clark,
 
 738 F.2d 869 (7th Cir.1984);
 
 Grubbs v. Houston First American Savings Association,
 
 730 F.2d 236 (5th Cir.1984) (en banc);
 
 In re Taddeo,
 
 685 F.2d 24 (2d Cir.1982). Today, we join them. Thus far, no court of appeals has held that a home mortgage default may be cured during a redemption period following a foreclosure sale. Two courts of appeals have declined to adopt that position as, now, do we.
 
 In re Glenn,
 
 760 F.2d 1428 (6th Cir.),
 
 cert. denied,
 
 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985);
 
 In re Tynan,
 
 773 F.2d 177 (7th Cir.1985).
 

 The analysis that supports our holding regarding the curing of defaults during a period of redemption leads to the conclusion that § 1322(b) must be read in the context of state law and that its right to cure a default on a mortgage on a home located in New Jersey terminates upon entry of a foreclosure judgment. This conclusion conflicts with the position of the Court of Appeals for the Sixth Circuit that the right to cure defaults on residential property in every state survives until a foreclosure sale is held.
 
 In re Glenn,
 
 760 F.2d 1428 (6th Cir.),
 
 cert. denied,
 
 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985).
 

 Our conclusion that the right of cure terminates in New Jersey upon the entry of a foreclosure judgment is informed not only by our analysis of the text of § 1322(b) and its legislative history, but also by our understanding of the relationship between federal bankruptcy law and the state law context in which it operates. For this reason, we include in this initial overview of the issue presented a review of the case law pertaining to federal-state relations in the bankruptcy area.
 

 B.
 

 Pursuant to Article I, § 8 of the United States Constitution, Congress has the power to establish uniform bankruptcy laws throughout the United States. “Where Congress has chosen to exercise its authority, contrary provisions of state law must accordingly give way.”
 
 Johnson v. First National Bank of Montevideo,
 
 719 F.2d 270, 273 (8th Cir.1983),
 
 cert. denied,
 
 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Nonetheless, “the usual rule is that congressional intent to pre-empt will not be inferred lightly. Pre-emption must either be explicit, or compelled due to an unavoidable conflict between the state law and the federal law.”
 
 Penn Terra Ltd. v. Department of Environmental Resources,
 
 733 F.2d 267, 272 (3d Cir.1984);
 
 accord In re Quanta Resources Corp.,
 
 739 F.2d 912, 915 (3d Cir.1984).
 
 See also Stellwagen v. Clum,
 
 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507 (1918) (“state laws are ... suspended only to the extent of actual conflict with the system provided by the Bankruptcy [Code] of Congress”). We begin with “the basic assumption that Congress did not intend to displace state law.”
 
 Penn Terra,
 
 733 F.2d at 272-73 (citing
 
 Maryland v. Louisiana,
 
 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)).
 

 “Proper respect, therefore, for the independent sovereignty of the several States requires that federal supremacy be invoked only where it is clear that Congress so intended. Statutes should therefore be construed to avoid pre-emption, absent an unmistakable indication to the contrary.”
 
 Id.
 
 at 273. Although “any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause,”
 
 Perez v. Campbell,
 
 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971), absent a conflict “between the state and bankruptcy laws, the law of the state where the property is
 
 *1374
 
 situated governs questions of property rights.”
 
 Johnson,
 
 719 F.2d at 273.
 

 The Supreme Court has emphasized that “Congress has generally left the determination of property rights in the assets of a bankrupt’s estate to state law.”
 
 Butner v. United States,
 
 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979). The Court went on to instruct that:
 

 Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving “a windfall merely by reason of the happenstance of bankruptcy.”
 
 Lewis v. Manufacturers National Bank,
 
 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323. The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests....
 

 Id.
 
 at 55, 99 S.Ct. at 918. Thus, absent a countervailing federal interest, “the basic federal rule is that state law governs.”
 
 Id.
 
 at 57, 99 S.Ct. at 919.
 

 Our task is to ascertain and give effect to congressional intent. However, we must approach that task with the realization that the Bankruptcy Code was written with the expectation that it would be applied in the context of state law and that federal courts are not licensed to disregard interests created by state law when that course is not clearly required to effectuate federal interests.
 

 III.
 

 We first determine whether the right to cure a home mortgage default under § 1322(b) survives contractual acceleration of the full mortgage debt. A plau- • sible argument can be made that it does not.
 
 See Grubbs v. Houston First American Savings Association,
 
 718 F.2d 694 (5th Cir.1983),
 
 reversed,
 
 730 F.2d 236 (5th Cir.1984) (en banc). The centerpiece of this argument is the assertion that a post-acceleration cure would modify the mortgage holder’s rights by extinguishing his state law entitlement to immediate payment in full. If this proposition be accepted, one can argue that § 1322(b)(2), which prohibits modification of “the rights of holders” of home mortgages, necessarily limits the authority to cure defaults granted by § 1322(b)(3). This second step is supported not only by the fact that such a reading would be necessary to effectuate § 1322(b)(2)’s prohibition, but also by the fact that § 1322(b)(3), in contrast to § 1322(b)(5), contains no express provision that the authority it grants is unaffected by the home mortgage limitations of § 1322(b)(2).
 
 [2]
 
 Finally, one can urge that § 1322(b)(5) is inapplicable after acceleration because the entire obligation is then immediately due and, accordingly, it cannot be said that the “last payment [on that obligation] is due” after the expiration of the plan. If one finds these three steps persuasive, § 1322(b) contains no authority for a plan to cure a home mortgage default following acceleration. We find them unpersuasive, however, primarily because of
 
 *1375
 
 the legislative history and the objectives of Chapter 13.
 

 Although a post-acceleration cure does alter a home mortgagee’s rights under an acceleration clause, and “modifies” its rights in that sense, a post-acceleration cure differs from other kinds of modification to a home mortgagee’s rights in that it does no more than return the debtor to full compliance with the mortgage and restore the original mortgagee-mortgagor relationship. There is good reason to believe that Congress was contemplating more substantial alterations of rights when it excepted home mortgagees’ rights from § 1322(b)(2)’s general authorization ■ to “modify the rights of holders of secured claims.”
 

 First, Congress placed the authorization to “modify the rights of holders” of various claims in § 1322(b)(2), separate from the authorization to cure defaults found in § 1322(b)(3) and the authorization to cure defaults and maintain payments on long-term debt obligations found in § 1322(b)(5), thus suggesting that Congress drew a distinction between modifications and cures. This suggestion is supported by the legislative history. In 1970, Congress established the Commission on the Bankruptcy Laws of the United States to propose revisions to the Bankruptcy Act; the Commission ultimately incorporated its recommendations in a draft statute and commentary. The Commission’s version of § 1322(b) authorized modification of the rights of holders of claims secured by personal property, as well as the curing of defaults on such claims, but authorized only the curing of defaults on home mortgages. The Commission distinguished the authorization to cure defaults on a home mortgage from the power to modify claimants’ rights, stating that the power to cure defaults did not “authorize reduction of the size or varying of the time of installment payments.” H.R. Doc. No. 137, 93d Cong., 1st Sess., Pt. II at 204-06 (1973),
 
 reprinted in Collier
 
 App. 2.
 

 In H.R. 8200, based in large part on the Commission’s draft,
 
 [3]
 
 the House eliminated any distinction between personal and real property, and authorized modifications of the rights of holders of all secured claims as well as the curing of defaults on such claims.
 
 [4]
 
 Passage of H.R. 8200 by the House spurred the Senate Judiciary Committee to approve its own bill. S. 2266 similarly distinguished between cure and modification of rights, but prohibited modifications to the rights of holders of claims secured by real property. S. 2266, 95th Cong., 2d Sess. (1978),
 
 reprinted in Collier
 
 App. 3. This limitation was adopted following testimony on behalf of secured credi
 
 *1376
 
 tors against the proposed power to modify claims by reducing the amount of the installment payments thereon or the secured amount thereof. No objections were made to the power to cure defaults, reverse contractual acceleration, and maintain payments, and no limitation was placed on the authorization to cure defaults in S. 2266’s version of § 1322(b)(3) and § 1322(b)(5).
 
 See id.;
 
 S.Rep. No. 989, 95th Cong., 2d Sess. 141 (1978), U.S.Code Cong. & Admin. News 1978, p. 5927,
 
 reprinted in Collier
 
 App. 3;
 
 In re Glenn,
 
 760 F.2d at 1433 n. 1;
 
 Grubbs,
 
 730 F.2d at 245;
 
 In re Taddeo,
 
 685 F.2d at 27-28. The House and Senate then agreed on the present version of § 1322(b)(2), protecting only home mortgagees and protecting them only from modification of their rights.
 

 The distinction between reversing contractual acceleration in the course of a cure and more serious alterations of a security holder’s rights is found elsewhere in the Bankruptcy Code. Section 1123 of Chapter 11 authorizes a plan to provide not only for the “modification of any lien, ... indenture or similar instrument,” but also, in a separate subsection, for the “curing or waiving of any default.” 11 U.S.C. § 1123(a)(5)(E)-(G). The section that immediately follows, § 1124, makes it clear that the authority to cure defaults may be exercised after there has been an acceleration and stipulates that the reversal of contractual acceleration shall not be regarded as an “impairment” of the secured creditor’s interest sufficient to confer upon him a right to vote upon the plan. 11 U.S.C. §§ 1124(2), 1126(f). This denial of a right to vote reflects a congressional judgment that “[t]he holder of a claim ... who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.” S.Rep. No. 989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & AdmimNews 1978, p. 5906,
 
 reprinted in Collier
 
 App. 3. Section 1123 of Chapter 11 and § 1322 of Chapter 13 are parallel provisions, and we believe it very likely that Congress’ understanding of the authorization to cure defaults in each was identical.
 

 Based upon the foregoing, we conclude that Congress did not view a cure of a home mortgage as a modification of the holder’s rights within the meaning of § 1322(b)(2) and, accordingly, that neither the power to cure under § 1322(b)(3) nor the power to cure under § 1322(b)(5) is limited by the provision of § 1322(b)(2) prohibiting modification of home mortgages.
 
 Accord, e.g., In re Taddeo,
 
 685 F.2d at 27;
 
 Grubbs,
 
 730 F.2d at 241-42, 246-47. Nothing in § 1322(b)(3) limits its authority to cure to pre-acceleration defaults and the Court of Appeals for the Second Circuit relied upon that fact in holding that § 1322(b)(3) authorized a post-acceleration cure of a longterm mortgage.
 
 In re Tad-deo,
 
 685 F.2d at 28. Although we are inclined to view the relationship between § 1322(b)(3) and § 1322(b)(5) somewhat differently, we agree that the authority conferred by § 1322(b)(3) cannot be limited to pre-acceleration cures and we believe that fact is important in evaluating the argument that the concluding clause of § 1322(b)(5) limits the authority therein conferred to unaccelerated mortgage obligations.
 

 Based on text and legislative history, we believe § 1322(b)(5) was intended to make it clear that the power to cure extends to longterm obligations that will survive beyond the life of the plan. When § 1322(b)(5) is so viewed, the function of § 1322(b)(3) is to provide authority for curing obligations that will be paid off during the life of the plan.
 
 See Grubbs,
 
 730 F.2d at 243-45. Because the legislative history provides no basis for concluding that Congress intended that post-acceleration cures would be authorized or not depending on the stage in the life of an obligation when the default happens to occur, we read § 1322(b)(5) to refer to “any secured claim on which the last payment [following cure of the default] is due after the date on which the final payment under the plan is due.”
 
 Accord, e.g., In re Clark,
 
 738 F.2d
 
 *1377
 
 at 874;
 
 Grubbs,
 
 730 F.2d at 247. Accordingly, we construe § 1322(b)(5) to authorize post-acceleration cure of longterm home mortgages.
 

 We believe that this construction of § 1322(b) best serves the objectives of Chapter 13. It is apparent that if § 1322(b) is construed not to authorize the reversal of an acceleration of home mortgage debt, it will rarely provide to debtors the relief contemplated by Congress. Given the availability and prevalence of automatic acceleration clauses, if § 1322(b)(5) is found to be available only before acceleration, it will be virtually meaningless in the home mortgage context. Moreover, as the Second Circuit has observed:
 

 Conditioning a debtor’s right to cure on its having filed a Chapter 13 petition prior to acceleration would prompt unseemly and wasteful races to the courthouse. Worse, these would be races in which mortgagees possess an unwarranted and likely insurmountable advantage: wage earners seldom will possess the sophistication in bankruptcy matters that financial institutions do, and often will not have retained counsel in time for counsel to do much good.
 

 In re Taddeo,
 
 685 F.2d at 27.
 

 Thus, considering the text of § 1322(b), its legislative history, and the practical consequences of the tendered alternative interpretation, we hold that § 1322(b)(5) authorized the cure of the Roaches’ default after the acceleration of the balance of the loan and at least up until the entry of judgment in the foreclosure proceeding.
 

 IV.
 

 Having determined that the right to cure a default on a home mortgage survives acceleration, we must confront the issue of when it terminates. When we apply the text of § 1322(b) in the context of New Jersey law, we are led to the conclusion that the right to such a cure expires when the mortgagee obtains a foreclosure judgment. Moreover, we conclude that beyond that point in the foreclosure process there are no substantial federal interests that would justify ignoring property interests created by the judgment of a New Jersey court. Accordingly, we hold that the bankruptcy court properly refused to approve the Roaches’ plan.
 

 As we have seen, § 1322(b)(5) authorizes plans that “provide for the curing of any default ... and maintenance of payments ... on any ... secured claim on which the last payment is due after” expiration of the Chapter 13 plan. Given the commonly understood meaning of the words “cure” and “default” in a context like this, we read § 1322(b)(5) to authorize the curing of a default in, and restoration of, a contractual relationship. When a debtor files a Chapter 13 petition in New Jersey and proposes a plan attempting to utilize the authority of § 1322(b)(5) after the entry of a foreclosure judgment, no contractual relationship remains and the mortgagee’s rights are those that arise from its judgment.
 
 Accord In re Brown,
 
 73 B.R. 306 (Bankr.D.N.J.1987). In New Jersey, as in many states, the mortgage is merged into the final judgment of foreclosure and the mortgage contract is extinguished.
 
 Colonial Building-Loan Ass’n v. Mongiello Bros.,
 
 184 A. 635, 637-38 (N.J. Ch. 1936);
 
 Elmora West End Building & Loan Ass’n v. Strede,
 
 100 A. 344, 345 (N.J. Ch. 1917);
 
 Hudson Trust Co. v. Boyd,
 
 84 A. 715, 715-16 (N.J. Ch. 1912); R. Cunningham & S. Tischler, 30
 
 New Jersey Practice: Law of Mortgages
 
 § 338 (1975);
 
 see also
 
 N.J.Stat.Ann. 2A:50-41, 50-44, 50-47, 50-50, 50-51 (West 1952) (providing specific instances where the mortgage lien will not be deemed merged with the judgment). As a result of this merger, there is no longer a mortgage to be cured and restored and the authority conferred by § 1322(b)(5) is simply inapplicable.
 

 More importantly, even if a mortgage were not extinguished when a judgment is entered, a final state court foreclosure
 
 *1378
 
 judgment in New Jersey establishes rights in the property distinct from those conferred by the mortgage. Under New Jersey law, “[t]he final judgment in an action to foreclose a real estate mortgage fixes the amount due under the mortgage and directs the sale of the real estate to raise funds to satisfy the amount due.”
 
 Eisen v. Kostakos,
 
 116 N.J.Super. 358, 282 A.2d 421, 424 (App.Div.1971);
 
 accord, e.g., Central Penn National Bank v. Stonebridge Ltd.,
 
 185 NJ.Super. 289, 448 A.2d 498, 504 (Ch.Div.1982). The judgment thus declares a sum certain immediately due and commits the proceeds of the sale of specific property to its satisfaction. Accordingly, even if a mortgage survives the entry of judgment in New Jersey, the mortgagee possesses independent rights by virtue of its judgment. This is significant because nothing in the cure provisions of § 1322(b)(5) suggests that Congress intended rights created by a final judgment to be extinguished by a § 1322(b)(5) cure. First, as we have noted, the relevant portion of § 1322(b)(5) is directed to cures of defaults in contractual relationships. Second, in the context of an obligation, like a judgment, that from its inception is immediately due and payable in its entirety, the concepts of “cure” and restoration have no practical significance. In short, even if a New Jersey mortgage survived the entry of judgment and could be cured under the provisions of § 1322(b)(5), those provisions would not authorize extinguishing or suspending the rights created by the judgment.
 

 The legislative history of the cure provisions of §§ 1322(b)(3) and 1322(b)(5), like their text, is also devoid of any suggestion that Congress intended to give home mortgage debtors the right to set aside or suspend state court judgments. If Congress had intended to grant such authority, we think its sensitivity to considerations of comity would have resulted in some explanation of the necessity for the intrusion on state sovereignty. In the absence of any such explanation, we can only conclude that Congress did not see cures of mortgage defaults as any threat to the integrity of state judgments.
 

 Nor can we perceive any reason why Congress might have felt it necessary or desirable to authorize the extinguishment or suspension of state judgments. Termination of the right of cure at the time of the entry of judgment, unlike termination upon contractual acceleration, does not significantly threaten the interests that Chapter 13 was designed to protect. In New Jersey, a foreclosure action is commenced by the filing of a complaint, as in other civil actions. NJ.Court R. 4:2-2. The complaint must be served upon the debtor and the debtor has at least twenty days to file an answer. NJ.Court R. 4:4-4,. 4:6-l(a). This provides notice which even an unsophisticated debtor is likely to take seriously and affords him or her time to consult with counsel about available courses of action. If a Chapter 13 alternative is chosen, there will be ample opportunity to exhaust the possibility of settlement and to file the petition before the state proceeding progresses to final judgment.
 

 In addition, a number of courts have noted that extension of the right of cure beyond the entry of a foreclosure judgment would create uncertainties in the application of state property law and the clouding of real estate titles.
 
 E.g., Matter of Skelly,
 
 38 B.R. 1000 (D.Del.1984);
 
 In re Pearson,
 
 10 B.R. 189 (Bankr.E.D.N.Y.1981). Although these problems perhaps might be overcome through use of the equitable power of a bankruptcy court to order parties to petition the state court for relief from its judgment,
 
 see, e.g., In re Gwinn,
 
 34 B.R. 936 (Bankr.S.D.Ohio 1983), the likelihood of even temporary uncertainty and such a cumbersome remedial process seem high prices to pay for the minimal aid that would be afforded debtors by extending the right to cure beyond the entry of judgment to the foreclosure sale or the end of the redemption period.
 

 In sum, in the absence of statutory language, legislative history, or a signifi
 
 *1379
 
 cant federal interest mandating federal interference with state foreclosure judgments, we are constrained to hold that in New Jersey the right to cure a default on a home mortgage under § 1322(b) does not extend beyond the entry of a foreclosure judgment.
 

 In so holding, we are mindful that two courts of appeals have affirmed the confirmation of Chapter 13 plans providing for cure of a home mortgage default following a state court foreclosure judgment. In particular, we note that a panel of the Court of Appeals for the Seventh Circuit, in
 
 In re Clark,
 
 738 F.2d 869 (7th Cir.1984), reversed a decision of Chief Judge Crabb,
 
 In re Clark,
 
 32 B.R. 711 (W.D.Wis.1983), that held, as we do, that cure of a home mortgage default cannot nullify a state court foreclosure judgment lien. The appellate court in that case, however, emphasized that, under Wisconsin law, a foreclosure judgment “does nothing but judicially confirm the acceleration,” 738 F.2d at 874, and declined to consider “whether the same result obtains in a state in which the effect of a judgment of foreclosure is different.”
 
 Id.; see also id.
 
 at 871 & n. 3. In
 
 In re Tynan,
 
 773 F.2d 177 (7th Cir.1985), another panel of the Court of Appeals for the Seventh Circuit found that, under Illinois law, a debtor could not cure a home mortgage default during a redemption period following a sheriffs sale “because there was no default to cure after judgment of foreclosure was entered.”
 
 Id.
 
 at 178. We agree with the conclusion reached in
 
 In re Tynan
 
 and attribute the difference between the result we reach and that reached in
 
 In re Clark
 
 to the apparent differences between the law of judgments in Wisconsin and New Jersey.
 

 A panel of the Court of Appeals for the Sixth Circuit, in
 
 In re Glenn,
 
 760 F.2d 1428 (6th Cir.1985), has taken a different approach. Reaching a result acknowledged to be “primarily a pragmatic one,” the court established foreclosure sale as “the cut-off date of the statutory right to cure defaults” in all states within the circuit.
 
 Id.
 
 at 1435. The court found it unnecessary to refer to the law of those states “in construing this federal statute,” noting that “practice varies so much from state to state that any effort to satisfy the existing concepts in one state may only create confusion in the next.”
 
 Id.
 
 at 1436.
 

 Although we agree that federal law controls the scope of § 1322(b)’s authorization to cure defaults, we do not believe that state law is irrelevant. As we have noted, the Supreme Court has indicated that, in bankruptcy, absent a federal interest requiring a different result, “[pjroperty interests are created and defined by state law” and “[ujniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.”
 
 Butner v. United States,
 
 440 U.S. at 55, 99 S.Ct. at 918. Despite its appeal, a desire for a uniform result in federal bankruptcy courts does not alone warrant the displacement of state law with judge-made federal law.
 

 Moreover, although we agree with the
 
 Glenn
 
 court that pragmatic considerations are important in construing the Bankruptcy Code, the more substantial practical concerns it cites do not seem to us to favor foreclosure sale over foreclosure judgment as a cutoff point. Finally, nothing in the text of the statute supports the choice of foreclosure sale as the terminating event. When a traditional application of the text of the Bankruptcy Code to the property interest defined by state law yields an answer that will serve the objectives of the Code, we decline to adopt, in the name of pragmatism, an answer not grounded in the language of the statute.
 

 V.
 

 For these reasons, we will affirm the order of the district court.
 

 [1]
 

 . We believe the parties err when they focus on how much of á property interest the Roaches retained following the foreclosure sale. The relevant text of § 1322(b) speaks of obligations of the debtor as to which cure of a default is authorized, not of the property interests of the debtor in property pledged to secure those obligations. Further, 11 U.S.C. § 108(b) simply extends the state law time period within which the debtor may exercise a state law right of redemption, e.
 
 g., In re Tynan,
 
 773 F.2d 177, 179-80 (7th Cir.1985);
 
 In re Glenn,
 
 760 F.2d 1428, 1436-40 (6th Cir.),
 
 cert. denied,
 
 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985);
 
 Johnson v. First National Bank of Montevideo,
 
 719 F.2d 270, 275-78 (8th Cir. 1983),
 
 cert. denied,
 
 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); § 108(b) has no bearing on the scope of the authorization to cure defaults found in § 1322(b). Finally, 11 U.S.C. § 362(a) does not toll the running of the state law redemption period.
 
 Id.
 
 Therefore, because the Roaches’ state law right of redemption lapsed after 60 days following the petition and because, as we hereafter hold, the Roaches cannot cure their mortgage default under 11 U.S.C. § 1322(b) as proposed in their plan, the bankruptcy court correctly granted the Lutzkers relief from the automatic stay.
 

 [2]
 

 . The strongest support for this argument is that it gives effect to the literal language of the "notwithstanding" clause of § 1322(b)(5), something that we cannot claim for our reading of § 1322(b). We acknowledge that, when read literally, there is no purpose for the inclusion of this clause if the curing of a default never results in a modification of a home mortgagee’s rights within the meaning of § 1322(b)(2). Based on legislative history, however, we agree with the Courts of Appeal for the Second, Fifth, and Seventh Circuits that this clause is superfluous and was added when the House and Senate bills were reconciled simply to emphasize that curing a default on a longterm home mortgage is permitted.
 
 See In re Taddeo,
 
 685 F.2d at 27;
 
 Grubbs,
 
 730 F.2d at 246;
 
 In re Clark,
 
 738 F.2d at 874.
 

 [3]
 

 . The other source from which Congress borrowed substantially in fashioning Chapter 13 was a statute and commentary drafted by the National Conference of Bankruptcy Judges. This statute expressly contemplated that cures would take place after acceleration. Section 6-301(2) provided in part that a plan:
 

 may provide for the curing of defaults within a reasonable time and the maintenance of payments while the case is pending on claims secured by a lien on the debtor’s residence:
 
 Provided, however,
 
 That it shall not be necessary in order to cure a default to make any payment due solely under a clause accelerating the obligation for nonpayment of any installment on a contract, whether or not the acceleration occurs before or after the initiation of a case under this chapter.
 

 H.R. 32, 94th Cong., 1st Sess. (1975) (Judges' bill).
 

 [4]
 

 . H.R. 8200’s § 1322(b) provided that a debtor’s plan might:
 

 (2) modify the rights of holders of secured claims or of holders of unsecured claims;
 

 (3) provide for the curing or waiving of any default;
 

 [[Image here]]
 

 (5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; ...
 

 H.R. 8200, 95th Cong., 1st Sess. (1977),
 
 reprinted in Collier
 
 App. 3; H.R.Rep. No. 595, 95th Cong., 1st Sess. 429 (1977), U.S.Code Cong. & Admin. News 1978, p. 6384,
 
 reprinted in Collier
 
 App. 2. The House Report explained that ”[p]aragraph (5) concerns long-term debt, such as mortgage debt.”
 
 Id.