**In the Matter of Frank Ernest CARDELL, an individual and d/b/a Old Coach Leasing; Gail Patricia Cardell, an individual; and FEC, Inc., a New Jersey Corporation, and Cardell & Associates, Inc., a New Jersey Corporation, Debtors.**

Bankruptcy Nos. 87–06076 to 87–06078, and 87–06495.

United States Bankruptcy Court,
D. New Jersey.

Feb. 10, 1988.

Crummy, Del Deo, Dolan, Griffinger & Vecchione, by Paul R. DeFilippo, Newark, N.J., for debtor.

Clapp & Eisenberg, by William S. Katchen, Vincent F. Papalia, Newark, N.J., for United Jersey Bank.

## OPINION

DANIEL J. MOORE, Bankruptcy Judge.

On October 5, 1987, Frank Cardell, Gail Cardell, his wife, and FEC, Inc. each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On October 23, 1987, Cardell & Associates, Inc. ("Associates"), also filed a petition for relief under Chapter 11 of the Bankruptcy Code. FEC, Inc. and Associates are wholly owned by Frank Cardell. By Order dated October 23, 1987, the four cases were consolidated for joint administration.[1]

This motion was filed by United Jersey Bank ("UJB") on October 9, 1987, four days after the petitions of FEC, Inc., Frank E. Cardell and Gail Cardell were filed. UJB requests relief as follows:

(A) The Court enforce the Judgment of Foreclosure entered in the Foreclosure Action (Docket No. F-6379-86) as to the Residential Property which establishes UJB's interest in such property; and (B) The Court enter an Order establishing the extent, validity and priority of UJB's security interest in and to the Commercial Property; and (C) The Court terminate, as to UJB, the stay provisions of § 362 of the Bankruptcy Code (11 U.S.C. § 362) and permit the Sheriff of Somerset County to sell the Residential Property in accordance with applicable law; or (D) The entry of an Order directing that the Debtors redeem the Residential Property by making payment in full under the Judgment of Foreclosure not later than 60 days after October 5, 1987; and (E)

the entry of an Order immediately requiring the Debtors to provide adequate protection for UJB's interest in the Commercial Property; or, alternatively, for (1) The entry of an Order converting the case to a case under Chapter 7; (G) The entry of an Order for the cost of suit and attorneys fees incurred herein; and (H) For such other relief as the Court deems just.

The court finds that it has jurisdiction over this case pursuant to 28 U.S.C. § 157. This is a "core proceeding" as defined in 28 U.S.C. § 157(2) and the judgment of this court can be appealed to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 158.

## FINDINGS OF FACT

Cardell & Associates, Inc. is a corporation owned and controlled by Frank E. Cardell. A former member of the National Association of Securities Dealers, its sales activities terminated on May 22, 1986. It is the debtor in case no. 87-06495.

FEC, Inc. is a corporation which provided services to Cardell & Associates in connection with its broker dealer operations, and is the debtor in case no. 87-06076.

Frank E. Cardell and Gail Cardell are the individual debtors in cases nos. 87-06077 and 87-06076.

Frank E. Cardell and Gail Cardell are the individual debtors in cases nos. 87-06077 and 87-06078.

Old Coach Leasing and Old Coach Realty, Inc. are entities owned and controlled by Frank E. Cardell. These affiliated companies are non-debtors which have guaranteed Frank Cardell's debt to UJB.

The credit transactions between the debtors and UJB date back to November 29, 1983. On that date, Frank E. Cardell borrowed $2.2 million from UJB and executed promissory notes in the amounts of $1.92 million and $.3 million. UJB as security received first and second purchase money

1. Frank Cardell, Gail Cardell, FEC, Inc. and Cardell & Associates may be referred to collectively hereafter as "debtors".

mortgages in the amounts of $1.92 million and $.3 million respectively on commercial property owned by Frank E. Cardell and Gail Cardell located in Hanover Township, New Jersey. The loans were also guaranteed by Gail Cardell and Associates. Associates granted UJB a security interest its accounts receivable as security for its guaranty.

Subsequently, on August 7, 1984, Frank Cardell executed a term note in the amount of $700,000 and a revolving note in the amount of $300,000. The proceeds of the revolving note were used to repay the $300,000 promissory note of November 29, 1983. As security for the August 1984 loans, the Cardells provided UJB with an amended second mortgage on the commercial property in the amount of $1 million and a second mortgage in the face amount of $1 million on property in Basking Ridge, New Jersey (the residential property). The loans were guaranteed by Gail Cardell, Cardell & Associates, FEC, Inc., Old Coach Realty and Old Coach Leasing. Associates delivered to UJB an amendment to the November 1983 Security Agreement and a UCC–1 financing statement reflecting a security interest in all of its accounts receivable. The face amount of the notes held by UJB was then $2.92 million (1.92 + .7 + .3).

On May 31, 1985 the loan agreement and arrangement between Frank Cardell and UJB were again changed to increase the revolving loan from $300,000 to $800,000. The second mortgages on the commercial and residential properties were amended to reflect an indebtedness of $1.5 million. As additional security Frank Cardell gave to UJB a security interest in all outstanding shares of Associates. The face amount of the paper held by UJB was then $3.42 million (1.92 + .7 + .8).

In April 1986, Frank Cardell entered into a refinancing of the commercial property with Security Pacific Business Finance, Inc. ("Security Pacific"). Frank Cardell turned over approximately $1.932 million from the proceeds of the refinancing to UJB to satisfy the first mortgage on the commercial property. Frank Cardell's obligation under the revolving note dated May 31, 1985 was reduced by $767,542.32 leaving a balance of $31,946.822 plus $562.01 interest. The debtors' indebtedness to UJB under the term note dated August 7, 1984 at that time was $550,000 plus $12,304.86 interest. The total obligation to UJB after refinancing was $594,813.19.

In March of 1986, in contemplation of the refinancing of the first mortgage on the commercial property, the guarantee of Associates was by agreement limited to $500,000. The agreement recites as one condition precedent the assignment to UJB of Associates right title and interest in two bank accounts maintained by Associates in Community Savings & Loan, Bethesda, Maryland, any and all "back end compensation" to which Associates may be entitled in connection with the sale of apartments by Wrightstown Partners and Ocean View Associates. (The March 1986 agreement also refers to certain commissions receivable, however, UJB already had a lien on all receivables of Associates.)

In June 1986, although the debt to UJB had been reduced further, Frank Cardell was in default under the term note. UJB proceeded to foreclose upon the mortgage on the residential property and obtained a final judgment of foreclosure in the Superior Court of New Jersey, Chancery Division, on May 29, 1987. Two scheduled foreclosure sales were adjourned and a third sale was scheduled for October 5, 1987, the day the individual debtors filed their petitions. Such a sale is presently stayed pursuant to § 362 of the Bankruptcy Code.

As of November 24, 1987, the total amount due to UJB on the judgment of foreclosure was $486,035.15. New Jersey Savings Bank holds the first mortgage on the residential property which secures a current indebtedness which the parties agree is approximately $57,000.00. Payments under the first mortgage, which include real estate taxes, are current. UJB alleges that Reliance Savings and Loan ("Reliance") claims a third mortgage on the Cardell's residence which secures the sum of approximately $250,000. The validity of this mortgage is in dispute. Reliance was

not a party to this proceeding and no evidence was introduced as to the validity of this debt and, therefore, it will not be considered by the court in its analysis of adequate protection and equity.

Both parties proffered testimony with respect to the value of the residential property. According to UJB's expert, the property is worth $435,000. The Cardells' expert testified that the property could sell for as much as $505,000. The court after evaluating the testimony of both experts and giving due consideration to their credentials and experience, finds that, if given an opportunity to market the residential property, the debtors could obtain a price of at least $460,000 for which they would realize after commissions and other selling expenses approximately $430,000.

The Cardells are also owners of commercial real estate located in East Hanover, New Jersey. The commercial property is subject to the first lien of Security Pacific, who holds a foreclosure judgment in the amount of $3,504,904.06. UJB holds the second mortgage on the commercial property. According to UJB's expert, the commercial property has a fair market value of $3.5 million.

The Cardells were negotiating a sale of the commercial property for the sum of $3.3 million. Security Pacific agreed to accept in full satisfaction of the Cardell's indebtedness $3 million plus any excess proceeds that remained after payment of real estate taxes and a $150,000 carve out to UJB. Since Security Pacific's agreement to accept $3 million was subject to contingencies which did not occur within the time period fixed, assigning any value to this collateral held by UJB would be highly speculative.

As noted earlier, UJB received a security interest in the accounts receivable of Associates as security for the guarantee from Associates which is limited to $500,000. The financial statement of Associates reflects accounts receivable in the amount of $1.7 million. Collection of accounts receivable by Associates has been slow in recent months. Frank Cardell explained that the lag in Cardell & Associates' collection efforts is due to the large number of suits filed against the debtors by their creditors in the pre-petition months. The debtors project that at least $453,000 will be collected on these accounts once collection efforts have recommenced. The debtor projects, as of December 1987, that $281,000 will be collected within six months, an additional $147,000 within 12 months, plus $25,000 in months 12 through 24. The projection of Associates does not include the collection of $93,250.00 discussed in the following paragraph nor does it include additional commission that will be payable as investors make scheduled payments for limited partnership interests. Typically, these payments are scheduled in three or four annual payments. No evidence was submitted to indicate that any specific account was not collectable, hence, it is not unreasonable to conclude collections will at least total the limit of Associates guarantee of $500,000.

The court's conclusion as to the value of Associates guarantee is based on Associates' evaluation of its own receivables and the absence of any evidence of non-collectability. The debtor's analysis and the court's conclusion both are supported in part by the following: (a) Subsequent to the hearing conducted on this application the court entered an order, now final, for the turnover to Associates of a fund in the amount of $93,250 plus the interest earned on the fund. The fund was being held in escrow in connection with an action pending in The Superior Court of New Jersey and represents commissions due Associates that were subject to claims of salespersons of Associates. The order further provides for the payment to UJB of the amount turned over on account of its claim against Frank Cardell. (b) Included in the projection of collections is the amount of $125,000 from Medina Stanley. The full amount of Associates receivable is $168,000. Medina Stanley has proposed the payment of $90,000 in twelve equal monthly installments. Associates' projection therefore appears to be realistic. (c) Associates asserts a claim of $137,000 against Marlton Plaza Associates on a back end compensation agreement with Marlton. The entire

profit of $294,000 realized by Marlton has been deposited with a Maryland state court and is subject to competing claims. Associates' projection includes $120,000 of this claim as collectible within six months.

Cardell & Associates also has potential claims for back end compensation which are not reflected as accounts receivable. Back ends are basically claims for compensation upon the sale of a tax shelter property by the promoter of the investment. Frank Cardell testified that his back end claims are worth between $3 and $5 million. The court recognizes, however, that the value of back end receivables are speculative in nature. The only such receivable that Frank Cardell was able to itemize was for the sum of between $50,000 and $60,-000. The March 1986 Agreement limiting Associates' guarantee to $500,000.00 was conditioned in part on the assignment to UJB of certain back end compensation so it is clear that UJB recognizes that some value exists with respect to these receivables. In summary, the value of UJB's collateral is as follows:

| | |
|---|---|
| Residential real estate $430,000 − $57,000 first mortgage = | $373,000 |
| Commercial real estate | -0- |
| Cardell & Associates guarantee | 500,000 |
| TOTAL | $873,000 |

## CONCLUSIONS OF LAW

UJB's initial request in this application is for relief from the automatic stay so that it can proceed with a foreclosure sale of the Cardell's principal residence.

## I. RELIEF FROM THE AUTOMATIC STAY

The Bankruptcy Code[2] permits modification of the automatic stay upon alternative

grounds. Relief may be granted under § 362(d)(1) upon a finding that the creditor's interest in property is not adequately protected or under § 362(d)(2) upon a finding that the debtor has no equity in the property and that the property is not necessary to an effective reorganization. *See In re Schramm*, 12 B.R. 608 (Bankr.E.D.Pa. 1981). UJB maintains (1) the debtor has not provided it with adequate protection and (2) the debtors have no equity in the residential property and that it is not necessary to an effective reorganization. Therefore, UJB claims that it is entitled to an Order granting relief from the automatic stay.

## A. LACK OF EQUITY AND NECESSITY FOR EFFECTIVE REORGANIZATION.

The burden of proof with respect to whether or not the debtor has equity in the collateral rests with the moving party. 11 U.S.C. § 362(g). The term "equity" under § 362(d)(2)(A) has been defined by the majority of courts as the difference between the value of the property and all encumbrances against it, including the interests of junior lienholders.[3] *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir.1984); *In re Faires*, 34 B.R. 549, 551 (Bankr.W.D.Wash. 1983). This court adopts the majority definition. For the reasons hereinafter set forth, this court is of the opinion that UJB has failed to meet the burden of proof that the debtor has no equity in the collateral.

For the purposes of determining the value of the debtors' property, the debtors' equity, and whether the creditor has adequate protection, the court is of the opinion that the value of *all* collateral should be

---

**2.** 11 U.S.C. § 362(d) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

**3.** The minority view does not take into account the interests of junior lienholders. Only the amounts owed to the lienholder challenging the stay and to senior lienholders are subtracted from the value of the property. *See e.g. In re Cote*, 27 B.R. 510, 513 (Bankr.D.Or.1983); *In re Palmer River Realty, Inc.*, 26 B.R. 138, 140 (Bankr.D.R.I.1983).

considered. This is appropriate here where UJB recognized at the outset that the mortgage on the commercial property did not adequately secure the indebtedness due to it. UJB required and received additional collateral.

■ The indebtedness of the Cardells to UJB on the foreclosure judgment as of November 30, 1987 was $486,035.15.[4] UJB's security for this indebtedness consists of a second mortgage on the debtors' commercial property; the second mortgage on the residential property which was foreclosed; a first lien on the accounts receivable of Cardell & Associates as security for guarantee of Associates; and the guarantees of Old Coach Leasing, Old Coach Realty and the Cardells. UJB can look to all of the above collateral to satisfy the amount due. The court has found as a matter of fact that the value of collateral is at least $873,000 after deducting the first mortgage from the value of the residential property. That amount exceeds the amount of UJB's judgment as reduced by $93,250 by approximately $480,000. Since there was no evidence of other liens[5], the debtors clearly have equity in the collateral.

As the moving party has not sustained its burden of proof with respect to the debtors lack of equity in the collateral, relief from the stay should not be granted under § 362(d)(2) and there is no reason for the court to make a determination as to whether the residence is necessary for an effective reorganization.

## B. LACK OF ADEQUATE PROTECTION.

The moving party also maintains that the debtor has not provided it with adequate protection of its interest in the commercial property. The Court must note initially that if it considers the commercial property by itself, UJB does not have an interest worthy of protection. This is so because UJB is undersecured with regard to the commercial property since the superior lien of Security Pacific exceeds the fair market value of the property. However, since the court has considered the debtors' property as a whole for the purposes of determining whether the debtor had equity, it shall also consider the debtors' property as a whole in determining whether UJB is adequately protected.

■ Under § 362(d)(1), it is clear that once the petition is filed, the burden is on the debtors to show that the secured creditor's collateral is adequately protected. *See In re Philadelphia Discount Co.*, 37 B.R. 946, 949 (E.D.Pa.1984). The concept of adequate protection is not precisely defined in the Bankruptcy Code. The determination of whether a secured creditor's interest is adequately protected must be considered in light of all the facts surrounding the case and the equitable considerations to which these facts give rise. *In re Southerton Corp.*, 46 B.R. 391, 398 (M.D.Pa.1982). Many courts have focused on the presence or absence of an equity cushion in determining whether a secured creditor has adequate protection of his collateral. *See In re Pitts*, 2 B.R. 476 (C.D. Cal.1979). An equity cushion has been defined as "the surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the collateral". *Commonwealth of Pennsylvania State Employees Retirement Fund v. Roane*, 14 B.R. 542, 545 (E.D.Pa.1981). If properly applied, the concept of an equity cushion supplies just one of several factors to be used in determining whether a creditors interest is adequately protected. *See In re Southerton Corp., supra,* at 398.

The adequate protection determination involves a conflict between necessarily competing interests. They are, the secured creditors property interest and the values promoted by the automatic stay, i.e., the public policy of preventing the piecemeal dismantling of a business through unilateral creditor action. *In re Philadelphia Consumer Discount Co., supra,* at 949.

---

**4.** This amount is now reduced by the $93,250 turned over to Associates and thereafter to UJB in January 1988.

**5.** The foreclosure judgment refers to other claims against the property but the amount of those claims has not been established.

The court has considered the equity cushion together with the projected stability of the value of the collateral.

■ In this case, the value of the collateral will not only be stabilized but it should also increase. As indicated supra, the debtors have equity in the collateral of approximately $480,000 and this interest is increasing as each payment on the first mortgage on the residential property reduces ·the principal amount of that debt. Accordingly, the court finds that UJB's secured claim is adequately protected.

## II.  THE *ROACH* DECISION

■ UJB places substantial reliance on a recent decision in this circuit, *In re Roach*, 824 F.2d 1370 (3d Cir.1987). Relying on *Roach*, UJB contends that it is entitled to payment in full, and that such right may not be extinguished or modified by a Chapter 11 reorganization plan. Furthermore, UJB contends that the *Roach* decision mandates that UJB be granted relief from the automatic stay. The court disagrees with these contentions.

In *In re Roach, supra,* the secured creditor obtained a foreclosure judgment and the principal residence of the Roaches was sold at a Sheriff's Sale to a third party. During the statutory period of redemption, the Roaches filed a petition under Chapter 13 of the Bankruptcy Code. The debtors proposed to cure their mortgage default under 11 U.S.C. § 1322(b).[6] After analyzing the text of 11 U.S.C. § 1322(b), its legislative history and practical considerations, the court initially held that § 1322(b)(5) authorized the cure of the debtor's default after the acceleration of the balance of the loan. Based upon its reading of § 1322(b) with New Jersey law, the court held that in New Jersey, the right to cure a default on a home mortgage under § 1322(b) does not extend beyond the

entry of a foreclosure judgment. *Id.* at 1379.

UJB argues that the *Roach* decision leads to the conclusion that UJB is entitled to immediate relief from the automatic stay. This contention reads too much into the *Roach* decision as the court did not discuss or decide whether the foreclosure judgment could be dealt with in the Chapter 13 plan. In addition UJB's position is in conflict with the express statutory language of 11 U.S.C. § 362(a)(2) which states that the filing of the bankruptcy petition operates as a stay, applicable to all entities of—"the enforcement against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title". Indeed, the House Judiciary Report pertaining to § 362 of the Bankruptcy Code states as follows:

> The automatic stay is one of the fundamental debtor protections provided by the Bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassments, and all *foreclosure actions.* It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy. (emphasis added)

H.R.Rep. No. 95–595, 95th Cong., 2nd Sess 174–175 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 6134–6136. The court further notes that although the decision has been distinguished and criticized, the case *Valente v. Savings Bank of Rockville,* 34 B.R. 362 (D.Conn.1983), held that a mortgage could be cured after foreclosure in a Chapter 11 case.

The *Roach* decision does not automatically grant the mortgagee relief from the automatic stay. As has been done here, the application must be made in accordance with the provisions of § 362(d) of the Bank-

---

**6.** In relevant part, 11 U.S.C. Section 1322(b) provides that a Chapter 13 plan may:

(2) modify the rights of holders of secured claims, other than a claim secured by only a security interest in real property that is the debtors principal residence ...;

(3) provide for the curing or waiving of any default ...;

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; ...

ruptcy Code.[7] As the court has found that, at the present time, the debtors have equity in their collateral and UJB is adequately protected, relief from the automatic stay is not warranted.

### III. EQUITABLE CONSIDERATIONS

It has long been established that bankruptcy courts are courts of equity and their proceedings are proceedings in equity. *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230, 1233 (1934). As a court of equity, this court is directed to apply "the principles and rules of equity jurisprudence". *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281, 287 (1939). The equitable considerations in the matter *sub judice,* provide further support for the denial of UJB's motion for relief from the automatic stay.

If UJB is allowed to proceed to an immediate foreclosure sale, the debtors will be denied the opportunity to reorganize their affairs in a manner of their own choosing. Such a denial would contravene the purpose of the automatic stay, which is to give the debtor a "breathing spell" from his creditors and to facilitate reorganization. *Matter of Roach,* 660 F.2d 1316, 1318 (9th Cir.1981); *In re Mr. D. Realty Co.,* 27 B.R. 359, 364 (Bankr.Ohio 1983). The Cardells have not been given an opportunity to reorganize their affairs in a manner that is beneficial to both the debtors and creditors. Rather, the Cardells have been impeded by this motion for relief from the stay filed just four days after the initial petitions. The Bankruptcy Code is designed to allow Chapter 11 debtors time in which to formulate a plan of rehabilitation free from creditor pressure. *In re Wolford Enterprises, Inc.,* 11 B.R. 571, 574 (S.D.W.Va.1981). Under § 1121 of the Bankruptcy Code the debtor has 120 days from the date of filing within which to file a plan of reorganization. By attempting to deprive the debtors of one of their major assets at such an early stage in the proceedings, UJB is imposing its reorganization plan upon the debtors. *See In re Wolford Enterprises, supra.*

A further equitable consideration in this case is the analysis of the credit transactions between Frank Cardell and UJB which date back to 1983. These credit transactions were loans from UJB to Frank Cardell. The two debtor corporations in this case are controlled by Frank Cardell and Mrs. Cardell is involved because of her status as a guarantor. The loans were incurred primarily as a business debt. In the eyes of equity, such a debt should be secured primarily by business collateral. In the case at bar, such collateral is the commercial premises and the accounts receivable of Cardell & Associates.

■ As a guarantor, Mrs. Cardell has an equitable right to compel UJB to seek satisfaction first from the principal debtor. *See Philadelphia Reading Railroad Co. v. Little,* 41 N.J.Eq. 519, 7 A. 356 (1886); *Foy v. Sinclair,* 30 S.W. 28, 30 (Tenn.1803). This right in equity is related to the remedy of marshalling assets which states that where a senior creditor has a lien on two funds or parcels, and a junior lienor has a lien on only one of these properties, a court of equity may compel the former to satisfy his debt out of the property which is encumbered only by his lien. *See In re Price,* 50 B.R. 226, 230 (Bankr.E.D.Mich.1985). As in marshalling, the creditor will be directed to a particular fund for satisfaction of its debt for equitable reasons. It has been recognized that the determination of whether or not a co-debtor—guarantor is entitled to this equitable relief depends on the extent of his or her commitment to the operations of the principal debtor. If the facts of the case reveal that the mortgage granted by the guarantor is in fact a contribution to the capital of the business, then equity will not distinguish between a primary and secondary debtor. *Moser Paper Co. v. North Shore Publishing Co.,* 83 Wis.2d 852, 266 N.W.2d 411, 417 (1978). In this case, there is no reason to conclude that Mrs. Cardell intended to place her share of the family residence in the "company till". *See Id.* 266 N.W.2d at 417, 418.

---

**7.** See footnote 2 *supra.*

This court considers Mrs. Cardell's liability as being secondary to that of Frank Cardell and the debtor corporations. Therefore, the sale of her equity in the residence should be allowed only when and if the business collateral held by UJB is not adequate to pay the debt. Her equity should be sold only as the last resort not the first.

As stated in *Farmers and Merchants Bank v. Gibson,* 7 B.R. 437, 440–41 (Bankr. N.D.Fla.1980):

> In addition, this liability to the particular creditor is only secondary to the primary liability of the principal debtor (the corporation). As such, the stockholder—guarantor has a right in equity that his principal's property first be made to satisfy the obligation he has guaranteed to the principal creditor before any resort is made to the guarantor's property ... compelling the paramount creditor to first seek from the guarantor would interfere with and unjustly impair the guarantor's equitable right to be exonerated by the principal debtor.

### CONCLUSION

Having found that the debtors have equity in their collateral and that the interest of UJB is adequately protected, that the case *In re Roach, supra,* does not entitle the mortgagee to immediate relief from the automatic stay, and that the equitable factors in this case support the continuation of the automatic stay, the motion by UJB is denied. Counsel for the debtor is directed to submit an order consistent with this opinion.