**In Re Steven W. ANANKO and Cynthia E. Ananko, his wife, Debtors.**

**Steven W. ANANKO and Cynthia E. Ananko, his wife, Plaintiff,**

**v.**

**David A. HARSANYI and Lieutenant John Randall, in his capacity as Sheriff of Morris County, Defendants.**

**Bankruptcy No. 88–03804.**
**Adv. No. 88–0426.**

United States Bankruptcy Court,
D. New Jersey.

July 11, 1988.

Michael S. Kopelman, Hackensack, N.J., for debtors/plaintiffs.

Betsch & Bennett by Robert J. Bennett, Jr., Morristown, for David Harsanyi.

Armand D'Agostino, Morris County Counsel, Dover by Daniel W. O'Mullan, Whippany, for John Randall.

OPINION

DANIEL J. MOORE, Bankruptcy Judge.

The debtors in this adversary proceeding seek, pursuant to 11 U.S.C. § 548, to set aside a sheriff's sale of their residence. Section 548 provides for the avoidance and setting aside of any transfer within one year of the filing of a petition in bankruptcy where the debtor received less than a reasonably equivalent value for the transfer. 11 U.S.C. § 548(a)(2)(A).[1]

All parties have filed briefs, the plaintiffs and the defendant Harsanyi have filed certifications with appraisals attached. With the exception of value of the property in question, the relevant facts are not in dispute. The parties have agreed that this matter is ripe for decision even though they could not stipulate to the value of property. The court agrees that sufficient evidence has been submitted to the court to make a finding as to "reasonably equivalent value" under § 548. Therefore, the Court issues its Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

The debtors purchased the property known as 21 Shenandoah Place, Morristown, New Jersey (the property) on May 3, 1985 for $130,000.00. The purchase was financed in part by a loan from City Federal Savings and Loan Association in the amount of $110,000.00. As security for the loan City Federal received a purchase money mortgage which is a first lien on the premises.

Mr. Ananko has a bachelor's degree in business administration and a master's degree in financial accounting. At the time the debtors purchased the property, Mr. Ananko was employed as an accountant. In January of 1986, after twelve years of service with his employer, Mr. Ananko took an accounting position with another company in hopes of better advancement opportunities which did not materialize. Mr. Ananko was unemployed except for occasional work from May of 1986 through July of 1987. In July 1987 Mr. Ananko found full employment with his present employer as an operational auditor and is presently earning $3,400.00 per month. Mrs. Ananko is employed by a major retailing company as a sales associate earning $500.00 per month. The debtors' petition reflects gross income of $23,000.00 in 1986 and $32,000.00 in 1987.

During the period of Mr. Ananko's unemployment the debtors fell into arrears on the mortgage to City Federal and incurred other debts. As a result of the Anankos' default on their mortgage, City Federal instituted foreclosure proceedings in the Superior Court of New Jersey in 1987 and a judgment of foreclosure was entered on February 18, 1988. On March 25, 1988 Writ of Execution was served upon the Sheriff of Morris County and May 16, 1988 was fixed as the sale date. In accordance with New Jersey law (N.J.S.A. 2A:61–1 *et seq.*) notice of the May 16, 1988 sale was given by advertisement in the *Morristown Daily Record* and *Morris News Bee* on April 22, April 29, May 6 and May 13, 1988. Notice was also given by posting a notice on the property on April 6, 1988.

The debtors consulted with Eugene R. Alexander, Esq. and attempted to refinance the mortgage with the Champion Mortgage Co., Inc. of Parsippany, New Jersey. As part of the process the debtors obtained an appraisal from the Izenberg Appraisal Service. That appraisal, dated April 7, 1988, values the debtors' property at $215,000.00.

---

1. 11 U.S.C. § 548 in pertinent part states:
   (a) the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
   \* \* \* \* \* \*

   (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
   (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a as a result of such transfer or obligation.

Although more than two and closer to three months have elapsed since the appraisal was obtained, the debtors did not offer evidence that they had obtained financing with Champion Mortgage Co., Inc. or any other lender.

On April 6, 1988 John McKenna, Esq., who had represented City Federal Savings and Loan Association in the foreclosure action, mailed letters to each of the debtors by regular and certified mail, and to their attorney Mr. Alexander, by certified mail only. The letters stated:

We enclose herewith a Notice of Sheriff's Sale regarding the above-captioned matter, which you will observe is scheduled for Monday, May 16, 1988.

Mrs. Ananko's signature signifying receipt of the letter on April 7, 1988 appears on the receipt for her letter as well as on her husband's. Mr. Alexander's signature appears on the receipt for his letter also dated April 7, 1988.

In the certification filed with the Court Mr. Ananko asserts that he believed that Mr. Alexander had adjourned the sale. However, in his certification, Mr. Ananko does not assert that he had discussions with the attorney concerning adjournment or that the attorney was requested to seek an adjournment. Furthermore there is no indication that the debtors inquired of Mr. Alexander with regard to the adjourned date after the scheduled sale. The role of the attorney and the scope of his retention is not spelled out on Mr. Ananko's certification. It is clear from the fact that the attorney received notice of the sale date and is listed as an unsecured creditor in the amount of $250.00, that he was in fact consulted by the debtor. The unpaid obligation of $250.00 to Mr. Alexander and the fact that the Statement of Financial Affairs reflects no payments to Mr. Alexander

within the year preceding the filing indicates that the attorney's representation was limited.

Mr. Ananko's first notice that the sale had taken place as scheduled on May 16, 1988 was on May 27, 1988 when the purchaser, Mr. Harsanyi, went to the house and informed the debtors that he purchased the property at the sheriff's sale. By that time the minimum 10 day period to redeem or object to the sale under New Jersey State law had elapsed.[2] The bid price of $129,475.00 was $6,812.16 more than the foreclosure judgment of $122,-662.84 due and owing to City Federal. In addition to the bid price, the terms of the sheriff's sale required Harsanyi to pay the sheriff's commissions of $3,717.00 and $485.00 to the clerk of Morris County for the Realty Transfer Tax and recording of the deed. Harsanyi had, at May 27, 1988, made an investment of $133,677.00.

The debtors and the Harsanyis were unable to agree on the terms for continued possession of the premises by the debtors and on Tuesday May 31, 1988, the debtors were served with a Writ of Possession for June 6, 1988. Faced with the fact that they had lost their home, the Ananko's consulted another attorney who referred them to their present counsel. In an effort to set aside the sale, the Ananko's filed a petition for relief under Chapter 11 of the Bankruptcy Code on June 6, 1988.

The schedules annexed to the bankruptcy petition set forth that the debtors have a net monthly income of $3,225.00 and the debtors' estimated expenses equals this amount. (*See* Appendix A). The schedules further reflect that the debtors have debt owing to GMAC in the amount of $18,-158.36 (this debt is scheduled as unsecured) secured by a 1987 Pontiac Sunbird and a

**2.** Rule 4:65–5 of the New Jersey Court Rules provides the following pertinent language:

A sheriff who is authorized or ordered to sell real estate shall deliver a good and sufficient conveyance in pursuance of the (foreclosure) sale unless a motion for the hearing of an objection to the sale is served upon him within 10 days after the sale or at any time thereafter before the delivery of the conveyance . . .

In 1970, the New Jersey Supreme Court construed the foregoing rule to mean that 'a mortgagor is entitled to redeem (foreclosed) property within a 10 day period for objections to sale and such right continues until an order confirming the sale is issued, in cases of timely filed objections.' *Matter of Brown*, 73 B.R. 306, 307–08 (Bankr.N.J.1987) *citing Hardyston National Bank v. Tartamella*, 56 N.J. 508, 513, 267 A.2d 495 (1970).

1988 Pontiac Fiero. The debtors unsecured debt totals $25,222.25 plus undetermined amounts due American Express and Mobil Oil Credit Corp. (*See* Appendix B). It appears that the liability to AHP Credit Union is listed twice, therefore, the total unsecured debt of the debtors is probably less than $25,000.00.

On June 7, 1988 the debtors filed the adversary proceeding to be decided herein. In the first count of their two-count complaint, the debtors demand judgment:

(a) preliminarily and permanently enjoining and restraining the defendants, David A. Harsanyi and Lieutenant John Randall, in his capacity as Sheriff of Morris County, from proceeding with Writ of Removal or taking any other action to deprive the plaintiffs of their ownership and possessory rights of the subject premises; (b) for judgment, voiding and setting aside the Sheriff's Deed with respect to the property struck off to the defendant, David A. Harsanyi, on May 16, 1988, and (c) for such other and further relief as is just[3].

In the second count of the complaint is a fallback position in the event the Court does not grant relief under the first count. The debtors request:

(a) that the Court stay defendants, David A. Harsanyi and Lieutenant John Randall, in his capacity as Sheriff of Morris County, from ousting the plaintiffs from the premises for a reasonable period of time in exchange for a reasonable use and occupancy charge; and (b) for such other and further relief as is just.

On June 7, 1987 an application was made to the Court for an Order to Show Cause with temporary restraints. After hearing counsel for the debtor and counsel for Mr. Harsanyi, the Court entered an Order to Show Cause with Temporary Restraints, which was returnable June 16, 1988. The Order temporarily enjoined and restrained the defendants from executing the Writ of Possession and required the debtors to deposit the sum of $1500.00 in their attorney's trust account as compensation to Mr. Harsanyi for use and occupancy of the premises.

Prior to the return date of the Order to Show Cause, the attorney for Mr. Harsanyi filed a number of appraisals reflecting the value of the property in question. The first appraisal was by Henry Hansch, a licensed appraiser, who has been in the business of purchasing properties at foreclosure sales for ten years. He states that he and other bidders ("several") were present at the sheriff's sale in question. Mr. Hansch valued the premises at $175,000.00 and decided not to bid any higher than $126,000.00. The second appraisal submitted was by David A. Pace, who is a member of the National Association of Real Estate Appraisers, with a C.R.E.A. designation. Mr. Pace values the property at $180,000.00. The third appraisal performed by Thomas Kachelriess of Professional Appraisal Associates. Mr. Kachelriess, a member of the Society of Real Estate Appraisers who has qualified as an expert in proceedings in the county where the property is located, values the property at $185,000.00. And the final appraisal was that of the defendant, Mr. Harsanyi, who is in the business of purchasing distressed properties. Mr. Harsanyi valued the property at $182,000.00.

In addition to the foregoing appraisals, the attorney for Mr. Harsanyi filed the appraisal conducted for the Township of Morristown by Certified Evaluations, Inc. This appraisal dated October 1, 1986 values the property at $162,300.00, which is also the assessed value of the property. A letter from the Tax Collector of Morristown indicates that the Town is assessed at 100% of true value. The Court takes judicial notice that Morris County's Equalization–Average Ratio of Assessed to True Value of Real Property for Morristown, found in the 1988 N.J. Lawyers Diary, is 116.18%, applying that average ratio to the assessed value of the property results in a true value of $140,000.00 (rounded), that rate, however, is based upon sales during 1986.

---

**3.** The certification of John Randall indicates that he is a lieutenant in the Morris County Sheriff's Office and that John Fox is Sheriff of Morris County.

The Kachelreiss appraisal and the Haranyi certification indicate the need for substantial work on the property to increase its marketability. The Pace appraisal indicates the need for both interior and exterior painting and replacement of rotted trim. Haranyi estimates that he will spend $10,000.00 to fix up the property to obtain his estimated sales price of $182,000.00. It is the opinion of the court that the cosmetic work recommended by Pace is reasonable and could be accomplished for $2,500.00.

The Eisenberg appraisal estimates marketing time of 3 to 6 months, Pace estimates less than 3 months. The certification of Hanch and Haranyi point out a significant increase in homes listed but unsold in Morris County. In April 1987 the number of homes listed with multiple listing was 4,500, in April of 1988 the number was 7,600. Both assert that the market is "soft" and a "buyers" market.

On the return date of the Order to Show Cause on June 16, 1988 having reviewed certifications, briefs and appraisals for the debtors and Mr. Harsanyi and hearing oral argument of all counsel, the Court reserved decision. All counsel were given the opportunity to file supplemental briefs addressing the issue presented to the Court. This opinion formalizes the bench opinion of June 29, 1988.

\* \* \*

The issue presented for determination is whether § 548(a)(2)(A) of the Bankruptcy Code permits a debtor to set aside a judicially ordered Sheriff's sale. This issue has yet to be decided in this District or the Third Circuit Court of Appeals.

In order to establish a fraudulent transfer under § 548(a)(2), five elements must be proven:

(1) that an interest of the debtor in property;

(2) was voluntarily or involuntarily transferred;

(3) within one year of the date of filing the petition;

(4) that the debtor received less than a reasonably equivalent value; and

(5) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof.

*In re Ristich,* 57 B.R. 568 (Bankr.N.D.Ill. 1986). Applying these elements to the case at bar, it is clear, using the lowest evaluation of the property, that the debtors had an interest in the property. That interest of the debtors was involuntarily transferred[4] by reason of the sheriff's deed on May 26, 1988 within one year of the date of filing their bankruptcy. A review of the petition establishes that the transfer left the debtors insolvent as defined by 11 U.S.C. § 101(31). The only element which needs to be satisfied is the fourth element, which requires that the debtor received less than "reasonably equivalent value for the property."

Upon consideration of the four full appraisals (Izenberg, Pace, Kachelriess and Certified), the data relating to comparable sales included with the Izenberg, Pace, Kachelriess appraisals and information contained in the opinion of Hansch and the defendant Harsanyi, the court concludes that the property has a value, in the present real estate market, in the range of $185,000 to $190,000.

The Court is of the opinion that the Izenberg Appraisal is less reliable than the others submitted. The Izenberg Appraisal compares the property in question with three other properties; 80 Mill Street which sold for $228,900, 59 Washington Avenue which sold for $219,000 and 42 Sherman Place which sold for $225,000. Each of those houses were larger than the debtors' and sold for an average of $135.22 per square foot of living space. The Pace Appraisal utilizes as comparable sales, properties that more closely approximate the size

---

**4.** While there had been debate on the holding in *Durrett v. Washington, infra,* that a foreclosure sale was a transfer within the meaning of the Bankruptcy Code, the addition of the phrase "foreclosure of the debtor's equity of redemption" to the definition of "transfer" in 11 U.S.C. § 101(48) now (50) and the phrase "voluntarily or involuntarily" at the end of the introductory paragraph in 11 U.S.C. § 548(a) by the Bankruptcy amendments and Federal Judgeship Act of 1984 seems to end that debate. *See In re Ruebeck,* 55 B.R. 163, 167 (Bankr.Mass.1985).

of the debtor's property and the average price of those sales is $134.46 per square foot of living space. The average selling price of all the comparables is slightly less than $135.00 per square foot. The appraisers differ as to the square footage contained at the subject property. Because of the variation in square footage the Court has used a range of $185,000.00 to $190,-000.00.

As indicated above the Court has less confidence in the Izenberg appraisal. There are two reasons. First, although his comparables average $135.22 per square foot, Izenberg's appraisal of the subject property calculates to $152.27 per square foot. The difference of $17.05 amounts to $24,000.00 (rounded) and may be explained by the fact that the appraisal was to be used for refinancing. The second reason that the Court has less confidence in the Izenberg appraisal may be due to the fact that there was some urgency in its preparation. The Court notes the fact that the Izenberg appraisal indicates that the property does not contain a fireplace when all of the other appraisals indicate the property has a fireplace. The pictures provided to the court with the appraisals indicate the property has a fireplace.

Debtor's supplemental brief approaches the question of reasonably equivalent value by pointing to the substantial gap between the bid price and defendant's appraisals, and concludes that the "gap" speaks for itself. The court, however, feels that it is not appropriate to compare the bid price with the appraised price as the bid price is a net figure. The total consideration paid by the Haranyis including Sheriff's commissions and transfer taxes was $133,-677.00. If the bid price is used as the measure then to arrive at a comparable figure it is necessary to consider that a sale in the normal course at $185,000.00 or $190,000.00 would net the sellers between $170,100.00 and $174,775.00 after fix up costs, real estate commissions (6%), Realty Transfer Tax ($700 or $725) and attorney costs using a modest $600.00 figure. The Court is of the opinion that if the sheriff's sale were voided, a resale of the property would be the only realistic way in which the debtor could satisfy the lien that the Haranyis would have pursuant to 11 U.S.C. 548(c). The debtors had not obtained the necessary financing at the time the June 16, 1988 hearing was conducted and there is little likelihood that the debtors will be able to refinance within their Chapter 11. In light of the default of the original mortgage of $110,000.00 resulting in a judgment of $122,622.94 and the two other creditors having instituted suit despite the full year of employment of Steven Ananko, it is unlikely that refinancing at the level of $150,000.00 needed for a plan is probable.

The determination of "reasonably equivalent value" of a foreclosure sale has been the focal point of ongoing debate. A leading case on this issue is *Durrett v. Washington*, 621 F.2d 201 (5th Cir.1980), which examined whether a non-judicial foreclosure sale could be set aside pursuant to 11 U.S.C. § 67(d) of the Bankruptcy Act.[5] Section 67(d) provided for the avoidance of any transfer within one year of the filing

---

5. Section 67(d) of the Act provides in pertinent part:
 (1) For the purposes of, and exclusively applicable to, this subdivision: ... (e) consideration given for the property or obligation of a debtor is "fair" (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred....
 (2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent (a) as to creditors existing at the time of such transfer or obligation, if made or incurred without fair consideration by a debtor who is or will be thereby rendered insolvent, without regard to his actual intent; ...

(6) A transfer made or an obligation incurred by a debtor adjudged a bankrupt under this title, which is fraudulent under this subdivision against creditors of such debtor having claims provable under this title, shall be null and void against the trustee, except as to a bona fide purchaser, lienor, or obligee for a present fair equivalent value; ...
 *And provided further*, That such purchaser, lienor, or obligee, who without actual fraudulent intent has given a consideration less than fair, as defined in this subdivision, for such transfer, lien or obligation, may retain the property, lien, or obligation as security for repayment.... (Emphasis in original).

of a bankruptcy petition where the amount received was not a "fair equivalent" of the property transferred. The Court in *Durrett* found that the sale constituted a transfer within the definition in 11 U.S.C. § 1(30) and therefore subject to 11 U.S.C. § 67(d). *Id.* at 204.

Examining then whether a "fair equivalent" was received by the debtor, the court stated "(W)e have been unable to locate a decision ... which has approved the transfer for less than 70 percent of the market value of the property." *Durrett v. Washington, supra* at 203. This language has been interpreted as the holding of *Durrett.* The property in question in *Durrett* has been sold for 57.7% of the market value. However, it has been recognized that the transfer in *Durrett* was set aside based upon a finding by the Court of less than fair equivalent, not the failure to meet a 70% threshold. *See In re Richardson,* 23 B.R. 434, 448 (Bankr.Utah 1982).

The leading case which goes against what is called the *Durrett* rule is *In re Madrid,* 21 B.R. 424 (9th Cir. BAP 1982). The Bankruptcy Appellate Panel held reasonable equivalent value pursuant to 11 U.S.C. § 548(a)(2)(A) is the same as consideration received at a non-collusive and regularly conducted foreclosure sale. *Id.* at 427. *See also In the Matter of Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir. 1985) (which stated, in dicta, the better view is that reasonable equivalence for the purpose of foreclosure sale under § 548(a)(2)(A) should be consonant with the state law of fraudulent conveyances. *Id.* at 1139). *In re Bundles,* 61 B.R. 929 (Bankr.S.D.Ind.1986) (which fully discussed the issue presented here and held that the sale is to be conclusively presumed to constitute "reasonably equivalent value" under 11 U.S.C. § 548(a)(2)(A)).

The Court of Appeals of the Ninth Circuit affirmed the holding of the Bankruptcy Appellate Panel in *Madrid* which declined to follow the *Durrett* rule, but on different grounds. The Circuit Court determined the transfer had occurred at the time the initial trust deed was recorded and perfected, which was more than one year

prior to the filing of the bankruptcy. *In re Madrid,* 725 F.2d 1197, 1199 (9th Cir.1984) *cert. denied* 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984).

A third approach was presented in *In re Hulm,* 738 F.2d 323 (8th Cir.1984), *cert. denied sub. nom., First Federal Savings & Loan Ass'n v. Hulm,* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984). The *Hulm* Court disagreed with the holding of the Bankruptcy Appellate Panel in *Madrid,* finding that the sale price at a regularly conducted foreclosure sale cannot be automatically deemed to provide "reasonably equivalent value" in the absence of fraud or collusion. *Id.* at 327. The Court, without mentioning *Durrett,* remanded the matter for an evidentiary hearing for a determination of whether the sale price constituted reasonably equivalent value.

Within this Circuit, the Eastern District of Pennsylvania has rejected the *Madrid* approach and in reviewing judicial foreclosure sales has set aside those where the court considered the price has to be less than reasonably equivalent value on a case by case basis. In some cases courts have considered *Durrett* without adopting a rigid 70% test. *See In re Corbett,* 80 B.R. 32 (Bankr.E.D.Pa.1987); *Butler v. Lomas and Nettleton Company,* 75 B.R. 528 (Bankr.E. D.Pa.1987); *In re Jones,* 20 B.R. 988, 944 (Bankr.E.D.Pa.1982), *In re Brunell,* 47 B.R. 830 (Bankr.E.D.Pa.1985); *In re Yorketown Associates,* 40 B.R. 701, 706 (Bankr.E.D.Pa.1984).

In the matter *sub judice* the debtors request this Court to adopt the *Durrett* rule, which has been followed in the Eastern District of Pennsylvania, requiring 70% of fair market value to be received at the sale. The Sheriff of Morris County would prefer that the Court adopt the *Madrid* approach which finds that the highest bidder at a non-collusive foreclosure sale establishes reasonably equivalent value. The sheriff maintains that any other result would cause severe and irreparable harm to New Jersey's statutory scheme for judicially ordered foreclosure sales. The legislative history of § 548 does not show an intent to avoid foreclosure sales. In sup-

port of this position the sheriff quoted from *In re Roach*, 824 F.2d 1370 (3rd. Cir.1987) which stated:

Proper respect, therefore, for the independent sovereignty of the several states rquires that federal supremacy be invoked only where it is clear that Congress so intended. *Statutes should therefore be construed to avoid preemption, absent an unmistakable indication to the contrary.*

*Id.* at 1373, *citing Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 273 (3rd Cir.1984) [Emphasis added].

The sheriff has also referred to the dialogue between Senator DeConcini and Senator Dole. [130 Cong.Rec. 13771, 13772 (daily ed. Oct. 5, 1984); remarks of Sen. DeConcini and Sen. Dole]. The dialogue reflects that Congress did not endorse the *Durrett* rule or for that matter the *Madrid* rule, when Congress amended 11 U.S.C. § 548(a)(2). While important, the comments occurred after adoption of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353 (BAFJA). As noted in *In re Ruebeck*, 55 B.R. 163, 167 n. 5 (Bankr.Mass.1985) citing to footnote 28 in *National Association of Greeting Card Pub. v. U.S. Postal Service*, 462 U.S. 810, 103 S.Ct. 2717, 73 L.Ed.2d 195 (1983), these statements cannot be interpreted as expressing Congressional intent.

Obviously, the purchaser in this case would be best served if the Court adopted the holding in *Madrid* which provides that "reasonably equivalent value" under § 548 should be analyzed in accordance with the state law of fraudulent conveyances. Therefore, reasonably equivalent value under § 548 would mean the same as the consideration received at a non-collusive and regularly conducted foreclosure sale. *In re Madrid, supra* at 427, *see also Matter of Winshall Settlor's Trust*, 758 F.2d

1136, 1139 (6th Cir.1985). In the alternative, the purchaser would prefer that the Court take the *Hulm* approach and make the determination of reasonably equivalent value based upon a case by case analysis [6] and disregard the 70% threshold set forth in *Durrett*.

■ This Court is not inclined to adopt the so called 70% rule of *Durrett* [7] any more than it is inclined to adopt the rule set forth by the Appellate Panel's decision in *Madrid* which provides that the price received at all non collusive sheriff sales constitutes "reasonably equivalent value." It is the opinion of the Court that such hard and fast rules are inappropriate, particularly when dealing with a subject as ethereal as value. Such rules are undoubtedly arbitrary and have little or no place in our jurisprudence. A reading of the cases cited by both parties and by the Court attests to the fact that courts are usually willing to review foreclosure sales, whether judicially conducted or not. Rule 11 of the Civil Rules of Federal Procedure and Bankruptcy Rule 9011 should provide sufficient deterrent to groundless requests for review. The court is not aware of any basis for giving more weight to the policy that favors finality of foreclosure sales than a policy which requires price to be reasonable. Finality is attainable by the payment of a reasonable price.

In determining "reasonable equivalent value" the court is guided by the holding in *In re Stanley Engineering Corporation*, 164 F.2d 316 (3rd Cir.1947). The Third Circuit, commenting on the failure of a bankruptcy court to confirm a judicial sale stated:

That judicial sales, made upon due notice and in accordance with law, will be confirmed unless (a) there was fraud, unfairness or mistake in the conduct of the sale; or (b) the price brought at the sale was so grossly inadequate as to

---

6. *See In re Adwar*, 55 B.R. 111, 114 (Bankr.E.D. N.Y.1985)

7. Using appraised values unadjusted for closing costs, the bid price with respect to the property as a percentage of value is Izenberg 60.2%, Hanch 73.9%, Pace 71.9%, Kachelreiss 69.98%

and Harsanyi 71.14%. Adjusted for closing costs, the bid price of $129,475.00 fails to meet the 70% *Durrett* test only with respect to value as fixed by the Izenberg appraisal. Based upon the Court's finding of value the recovery is between 74% and 76% of the adjusted sales price.

shock the conscience of the court and raise a presumption of fraud, unfairness or mistake. Mere inadequacy of price is not a sufficient ground for setting aside a judicial sale where there was no unfairness in the conduct of the sale. In determining whether gross inadequacy exists the bankruptcy court must take into consideration appraisement of the property as a guide in the exercise of its discretion in accordance with the intendment of the statute cited. *Where the bankruptcy court fails to confirm a judicial sale in the absence of unfairness, fraud or mistake or gross inadequacy of price, its action will be reversed on the ground of abuse of its legal discretion.*

*Id.* at 318–19 [8]. The law of New Jersey is in accord with this result. *See Eberhart v. Gilchrist,* 11 N.J.Eq. 167 (1856). (The Court found mere inadequacy of price, is not enough for the Court to interfere with a sale under its own decree, unless, the price is so grossly inadequate that from such inadequacy the Court may infer fraud)

The Third Circuit reaffirmed its opinion in *Stanley* in *In re Time Sales Finance Corporation,* 445 F.2d 385 (3rd Cir.1971). In *Time Sales,* the referee set aside a confirmed private sale based upon an oversight by counsel for the trustee, who failed to notify the original bidder and his agent of the time and place of the hearing for confirmation of the proposed sale. At the hearing a bid of $500.00 higher than the original bid was received and confirmed. The Third Circuit stated the referee's action in requiring a new confirmation hearing on the original bid was fully in line with the *Stanley* opinion. *Id.* at 387.

The test set forth in *Stanley* is most equitable and the standard in this district, with regard to judicial sales. The Court, therefore, holds that the price obtained at a judicial foreclosure sale that would not be overturned under *Stanley* is "reasonably equivalent value" under 11 U.S.C. 548(a)(2)(A).

In the present case, the debtors, in accordance with New Jersey Law were served with the complaint in the foreclosure action and received notice of the judgment of foreclosure. During this time the debtors did consult an attorney, Mr. Alexander, who apparently advised the debtors to seek refinancing. In addition, the debtors had notice of the sheriff's sale pursuant to a judgment of foreclosure by mail and a posting of the notice of sale at the property. All of the foregoing gave the debtors, to quote Judge Stapleton, "notice which even an unsophisticated debtor is likely to take seriously." *In re Roach, supra,* at 1378.

The sale therefore took place and the debtors had a 10–day period to file a notice of objection to the sheriff's sale based upon a showing of fraud, accident, surprise or mistake, irregularities in the sale and the like. R. 4:65–5; *Karel v. Davis,* 122 N.J.Eq. 526, 528, 194 A. 545 (E & A 1937). However, the debtors in this case failed to raise the appropriate objections to the sale under state law. Most importantly, the debtors have failed to establish before this court that there was fraud, unfairness or mistake in the conduct of the sale.

■ The Court has concluded the selling price of the property under normal circumstance would be in the range of $185,000.00 to $190,000.00 with the value of the debtor's interest being in the range of $170,-100.00 to $174,775.00. Giving due consideration to that finding and the intendment of 11 U.S.C. § 548, the Court does not find that the price received this well noticed Sheriff sale is grossly inadequate.

For all of the foregoing reasons, this Court finds that the price received at the foreclosure sale constitutes the "reasonably equivalent value" of the debtors' property. While the Court has the authority to undo that which has been done, pursuant to 11 U.S.C. § 548(a)(2)(A), the Court will not do so in this case.

Although it has been determined that the consideration paid by the Harsanyis represented the reasonably equivalent value of

---

**8.** *See also Magnolia Springs Apartments, Inc. v. United States,* 323 F.2d 726 (5th Cir.1963) *citing Stanley, United States v. Wells,* 403 F.2d 596 (5th Cir.1968).

the property transferred, the Court believes it appropriate to analyze the effect of undoing the sheriff's sale if the determination was that the price was not the reasonably equivalent value. It has not been asserted that the Harsanyis are not good faith purchasers for value, nor would the facts support a finding that such was not the case. As purchasers for value the Harsanyis would be entitled pursuant to 11 U.S.C. § 548(c) to a lien on the property to the extent of the consideration paid.

■ As a Court of equity the Court should also take into consideration the adverse effect that a recission of the deed would have on the Harsanyis. As noted earlier David Harsanyi is in the business of purchasing distressed properties, refurbishing them and thereafter reselling them for profit. Harsanyi financed the purchase of debtors' property by taking out a equity loan on his own home. While the Court has temporarily provided for the payment to the Harsanyis for their costs in carrying the property, that payment does not recognize three factors. First, since May 26, 1988 the debtors have had the benefit of the Harsanyis' credit. Second, this proceeding and any subsequent appeal adversely affects the ability of the Harsanyis' to make the profit they had anticipated. Their business involves risk and that risk is most likely increasing with the passage of time because of present market conditions affecting real estate. Third, the Harsanyis, through no fault of their own, have incurred legal expenses which are not ordinary for their business. Equitably, if they are forced into the position of a secured lender, they should be reimbursed for that extraordinary expense. The foregoing factors would have to be considered in fixing a lien under 11 U.S.C. 548(c) or alternatively by the Court pursuant to 11 U.S.C. 105(a) and the Court estimates that the total would approximate $150,000.00 if the property were able to be resold promptly. Thus in the best case (a sale at $190,000.00 which would net $174,775.00 supra p. 14) the estate would be enhanced by $24,775.00 but subject to debtor's claimed exemptions of $15,000.00 [9] pursuant to 11 U.S.C. 522(d)(1) leaving $9,775.00 (subject to administration costs) available for creditors. This would be a best case result but is speculative with the risk borne by the Harsanyis.

## Appendix A

1. Home Expenses:
   a. Rent or home loan payment (including any assessment or maintenance fee) $1,300.
   b. Real estate taxes $——
   c. Utilities:

| | | |
|---|---|---|
| Electricity | $100. | |
| Gas | $ 10. | |
| Water | $ 10. | |
| Telephone | $ 80. | |
| Other (specify) Oil | $ 50. | |
| sewer | $ 10. | |
| Total Utilities: | | $ 260. |

   d. Home maintenance (repairs and upkeep) $ 50.
   Total, all home expenses: $1,610.

2. Other expenses:
   a. Taxes (not deducted from wages or included in home loan payment or included in real estate taxes) $——

[9] The Court is not unmindful that the loss of a home is a tragic event. However, after considering the fact that these debtors literally ignored the entire foreclosure proceeding, were willing during a period of financial distress to obligate themselves for the purchase of two new automobiles, and finally have failed to avail themselves of the benefit of Chapter 13 of the Bankruptcy Code, which would have stayed the foreclosure action, afforded them the opportunity to cure the default and deal fairly with their creditors, does not move the Court to exercise any equitable powers which it might have to salvage their exemption or any equity of redemption they may have lost.

b. Alimony, maintenance, or support payments (attach additional sheet listing name, age, and relationship of beneficiaries) $——

c. Insurance (not deducted from wages)

| | |
|---|---|
| Life | $ 25. |
| Health | $—— |
| Auto | $150. |
| Homeowner's or Renters | $—— |
| Other (specify) | $—— |
| Total Insurance expenses: | $ 175. |

d. Installment payments

| | |
|---|---|
| Auto | $ 495. |
| Other (specify) | $—— |

| | |
|---|---|
| e. Transportation (not including auto payments) | $ 100. |
| f. Education (including tuition & school books) | $—— |
| g. Food | $ 500. |
| h. Clothing | $ 125. |
| i. Medical, dental, and medicines | $ 25. |
| j. Laundry and cleaning | $ 50. |
| k. Newspapers, periodicals, and books | $ 20. |
| l. Recreation, clubs & entertainment | $ 100. |
| m. Charitable contributions | $ 25. |
| n. Other expenses (specify) | $—— |

| | |
|---|---|
| Total estimated current monthly expenses: | $3,225. |

## Appendix B

| | | |
|---|---|---|
| Clifford A. Taylor, M.D.<br>20 Community Place, 3rd Floor<br>Morristown, New Jersey 07960 | — # H5937180 | $ 706.00 |
| AHP Employees Credit Union<br>c/o Russell H. Hulsizer, Esq.<br>99 Summit Avenue<br>Summit, New Jersey 07901 | | 2,375.89 |
| AHP Employees Credit Union<br>League Collection Service<br>77 North Centre Avenue<br>Rockville Centre, N.Y. 11570 | — # 18293 | 2,300.00 |
| Citibank, N.A.<br>P.O. Box 1225<br>Old Chelsea Station<br>New York, N.Y. 10113 | — # 837504040 | 3,892.22 |
| American Express Company | — # 3787–136705–61002 | Undetermined |
| GMAC<br>P.O. Box 298<br>Parsippany, N.J. 07054 | — # 324–0334–56102 | 9,012.00 |
| GMAC<br>P.O. Box 298<br>Parsippany, N.J. | — # 324–0334–66917 | 9,146.36 |
| Morris County Savings Bank<br>21 South Street<br>Morristown, N.J. | — # 01–06–098590 | 6,996.16 |
| Drs. Bippart, Hnat & Kuchera<br>c/o Rocco M. Clarizio, Esq. | | |

**410**

■■■■■■■■■■■■■■■■

■■■■■■■■■■■

420 Chestnut St.
Union, N.J. 07083                                                    $1,909.09

Horizon—Visa
P.O. Box 870
Parsippany, N.J. 07054          —        # 4103–065–043984             997.45

Horizon—Overdraft Account
P.O. Box 700
Parsippany, N.J. 07054          —        # 042–780–955–3               812.73

Bloomingdales
P.O. Box 11407
Birmingham, Al. 35246           —        # 467–70–798                  732.10

Mobil Oil Credit Corp.
P.O. Box 419600
Kansas City, Mo. 64141          —        # 889–042–44611          Undetermined

Macy's New Jersey
Louisville, Ky 40285–8420       —        # 357–97–797                  277.34

Citibank Mastercard
P.O. Box 6500
Hagerstown, Md. 21747           —        # 542418–0263–94412         2,038.61

Citibank Visa
P.O. Box 6500
Hagerstown, Md. 21747           —        # 4128–470–804–233          1,934.66

Eugene R. Alexander, Esq.
The Bradford Suite 108
256 Columbia Turnpike
Florham Park, N.J. 07932                                              250.00