Steven W. ANANKO and Cynthia E. Ananko, his wife, Plaintiffs–Appellants,

v.

David A. HARSANYI and Lieutenant John Randall, in his capacity as Sheriff of Morris County, Defendants–Appellees.

Civ. A. Nos. 88–3645, 88–3646.

United States District Court,
D. New Jersey.

Oct. 12, 1988.

Michael S. Kopelman, Hackensack, N.J., for plaintiffs-appellants.

Betsch and Bennett by Robert J. Bennett, Jr., Teaneck, N.J., for defendant-appellee David Harsanyi.

Armand D'Agostino, Morris County Counsel by Daniel W. O'Mullan, Asst. County Counsel, Whippany, N.J., for defendant-appellee Lieutenant John Randle.

## OPINION

DEBEVOISE, District Judge.

### NATURE OF THE CASE

This is an appeal from an order of the United States Bankruptcy Court for the District of New Jersey. After filing under Chapter 11 of the Bankruptcy Code, debtor/appellants, Steven and Cynthia Ananko, brought an action under 11 U.S.C. sec. 548 against appellees, David Harsanyi and Lieutenant John Randall, to set aside the sheriff's sale of their residence as a fraudulent conveyence. The bankruptcy court denied the requested relief and the Anankos now appeal to this court. Appellee Harsanyi has filed a cross-appeal.

### FACTS [1]

On May 3, 1985, appellants purchased the house and land located at 21 Shenandoah Place, Morristown, New Jersey for $130,000. Appellants gave City Federal Savings and Loan Association ("City Federal") a purchase money mortgage on the property in exchange for $110,000 towards the purchase price. Some time in 1986 Steven Ananko lost his job as an accountant. During the ensuing period of his unemployment the appellants' fell behind on their mortgage payments to City Federal. This prompted City Federal to institute state foreclosure proceedings which concluded with the entry of a judgment of foreclosure by the Superior Court of New

---

**1.** The factual background of this matter is amply discussed in the opinion of Judge Moore. However, I will briefly recount the facts which are helpful in resolving the issues presented to this court.

Jersey on February 18, 1988. The amount of this judgment was $122,662.84.

On March 25, 1988, a Writ of Execution was delivered to the Sheriff of Morris County and an execution sale was set for May 16, 1988. Although proper notice of the sale was given by the sheriff and received by appellants, the appellants did not appear at the foreclosure sale to seek an adjournment or otherwise to protect their rights. Appellants claim that their failure to appear and their subsequent failure to redeem the property within the allowable ten day period after sale as provided by New Jersey law (N.J.Civ.Ct.Rule 4:66–5), was due to their reliance on the faulty advice of their former counsel. Appellants claim that they mistakenly believed that their attorney had adjourned the sale, and did not discover that he had not done so until considerably later.

Appellee Harsanyi, who is in the business of buying and reselling distressed properties, submitted the highest bid at the sheriff's sale, purchasing the property for $129,475 excluding costs.[2] On May 31, 1988, the appellants were served with appellee's Writ of Possession effective June 6, 1988. After consulting a new attorney, appellants filed under Chapter 11 of the Bankruptcy Code on June 6, 1988, seeking to avoid the sale of their house under 11 U.S.C. sec. 548(a)(2)(A). The bankruptcy court issued an "Order to Show Cause with Temporary Restraints," which was returnable June 16, 1988. This order was issued on June 7, 1988, temporarily enjoining appellees from executing the Writ of Possession.

The opinion of bankruptcy court notes that prior to the return date of the order to show cause, Mr. Harsanyi's attorney filed a number of appraisals "reflecting the value of the property in question." (89 B.R. 399 at 402). These documents are part of the record before this court and I have reviewed them along with the remainder of the record. Appellee Harsanyi submitted a total of four appraisals, including his own. These appraisals estimated that the property in question was worth the following amounts respectively: $175,000; $180,000;

$185,000; and $182,000. Appellants submitted one appraisal which estimated the value of the property to be $215,000. The bankruptcy court issued its findings as to the fair market value of the property and the reasonableness of appellee's purchase price without holding an evidentiary hearing on these matters.. Thus, the bankruptcy court decided these issues based solely on the documents contained in the record.

Appellants contend that the bankruptcy court erred in several respects: (1) by not holding an evidentiary hearing at which appellants could have testified about how they would reorganize their debts; (2) by making inferences about the scope of appellants' former attorney's representation of the Anankos during the foreclosure period; (3) by not holding an evidentiary hearing to determine the fair market value of appellants' property and whether appellee paid reasonable equivalent value for the same; (4) by making impermissible inferences about fair market value based solely on the appraisal documents submitted; (5) by initially representing to appellants that they would be afforded an evidentiary hearing and later denying one. In addition to countering these claims by appellants, appellee Harsanyi contends that even if the bankruptcy court erred by failing to conduct an evidentiary hearing, this court must affirm its decision because the bankruptcy court applied the wrong legal standard. The standard appellee urges this court to adopt requires that a non-collusive foreclosure sale be deemed final and impervious to the avoidance power of section 548. I will discuss each of these issues as necessary. However, under my view of the case this appeal presents essentially two issues: whether the bankruptcy court applied the correct legal standard to determine "reasonably equivalent value" under section 548 of the Bankruptcy Code, and whether it was error for the court to make its findings on this matter solely based on the documents submitted and without an evidentiary hearing.

## STANDARD OF REVIEW

This court must uphold the factual findings of the bankruptcy court, unless they

---

**2.** The total price to appellee was $133,677 which      included taxes and sheriff's commissions.

are "clearly erroneous." Fed.R.Civ.P. 52(a); *In re Huntington, Ltd.*, 654 F.2d 578, 583 (9th Cir.1981); *See also Inwood Laboratories v. Ives Laboratories*, 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). This court is empowered to review *de novo* the bankruptcy court's conclusions of law. *In re Daniels–Head & Associates*, 819 F2d 914 (9th Cir.1987); *see also In re AOV Industries, Inc.*, 792 F.2d 1140, 1146 (D.C.Cir.1986).

## BACKGROUND OF SECTION 548 AND FORECLOSURE SALES

Section 548 of the Bankruptcy Code provides for the avoidance of a "transfer" within one year of the date of filing a petition for bankruptcy.[3] Section 548(a)(2)(A) permits avoidance of any transfer "for less than a reasonably equivalent value." *Id.* The Code defines a "transfer" as:

> "... every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest *and foreclosure of the debtor's equity of redemption* ..."[4]

11 U.S.C. sec. 101(50) (emphasis added).

There are conflicting authorities as to whether foreclosure sales fall within the ambit of section 548. Some courts have adopted the "Madrid Rule" which was first set forth in *In re Madrid*, 21 B.R. 424 (9th Cir.A.P.1982) *aff'd. on other grounds*, 725 F.2d 1197 (9th Cir.1984). In that case the trial court held that the highest bid at a non-collusive judicial foreclosure sale establishes the reasonably equivalent value of the property as a matter of law. On the appeal of *Madrid*, the Ninth Circuit affirmed on other grounds. It held that the debtor "transferred" the property to the creditor when the security interest in the house was perfected. 725 F.2d at 1200. In *Madrid* perfection occurred more than one year before the debtor filed for bankruptcy. Thus, the *Madrid* court concluded that the foreclosure sale was not a transfer within one year before the date of filing the petition as required by section 548. *Id.* at 1201. It is important to note that this position ignores the fact that that the debtor typically has equity in the house. This equity interest of the debtor is "transferred" within the meaning of the Code, when the house is sold at a foreclosure sale.[5]

The Fifth Circuit has adopted a position contrary to that of the *Madrid* court. In *Durrett v. Washington*, 621 F.2d 201 (5th Cir.1980), the Fifth Circuit held that the dispensation of a debtor's property at a

---

3. 11 U.S.C. 548. This section provides in the relevant part: (a) the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within one year before the date of filing of the petition, if the debtor voluntarily *or involuntarily*—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.
11 U.S.C. 548(a)(2)(A) and (B)(i). (underscored portion was added by amendment in 1984)

4. The underscored language was added by the 1984 amendments to the Bankruptcy Code and codified at 11 U.S.C. sec 101(48). In 1986, the Code was again amended and this same provision was re-codified at 11 U.S.C. sec. 101(50).

5. For this reason, it is likely that the 1984 amendments to the Bankruptcy Code which added "foreclosure of debtor's equity of redemp-

tion" to the list of transfers under sec. 101(50) and included "involuntary" transfers under sec. 548, were meant to reject the position taken in *Madrid*. *See* COLLIER ON BANKRUPTCY par. 1300.12(32). The only indication to the contrary is found in a portion of the legislative record concerning the 1984 amendments, which suggests that Congress intended to preserve the finality of non-collusive foreclosure sales. 130 Cong.Rec. S.13771–S.13772 (No. 131, Pt. II, October 5, 1984). Significantly, these senatorial statements were not part of the debate over the amendments, but were placed on the record after the amendments were passed by Congress.

Appellee urges this court to apply the standard developed in *Madrid* to this case. However, I agree with those authorities who note that the 1984 amendments to the Code make application of Madrid an impossibility, regardless of how compelling the state interests in foreclosure may be. The bankruptcy court was correct in rejecting this approach.

foreclosure sale constitutes a transfer under the Bankruptcy Code, thereby making foreclosure transactions avoidable under section 548. Accordingly, the *Durrett* court allowed the plaintiff to avoid a foreclosure transfer under section 548 because the property was sold for only 57.7 percent of its fair market value. The *Durrett* court suggested that any sale for less than 70 percent would be avoidable as less than "reasonably equivalent value." In more recent decisions applying the *Durrett* rationale this bright line, 70 percent rule has given way to a case by case analysis for determining reasonably equivalent value. *See e.g., In Re Hulm,* 738 F.2d 323 (8th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984).

In *Hulm,* the Eighth Circuit held that the determination of "reasonably equivalent value" must be made on a case by case basis. The *Hulm* court held:

> We do not believe the sale price at a regularly conducted foreclosure sale, although absent collusion, can automatically be deemed to provide a reasonably equivalent value in exchange for the interest of the debtor transferred within the meaning of section 548(a). In our view, the question of whether the sale price provided a reasonable equivalent value cannot be answered without an evidentiary hearing.

Id. at 327. The court in *Hulm* indicated its awareness of the possible ill affects its decision would have on foreclosure sales. The court noted, however, that it was enforcing the "clear" meaning of the statute, thus "policy considerations cannot affect the outcome of this case, but must be addressed, if at all, by Congress." *Id.*

## DISCUSSION

■ The bankruptcy court referred to *In re Stanley Engineering Corp.,* 164 F2d. 316 (3d Cir.1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417(1947) for guidance in determining the extent to which section 548 applies to a state foreclosure sale. *Stanley* involved the Third Circuit's review of a bankruptcy court or-

der which rejected the highest bid on debtor's property at a public sale in order to accept a higher bid which was received at an ensuing bankruptcy hearing. In the instant matter the bankruptcy court particularly relied on the following passage from *Stanley:*

> [J]udicial sales, made upon due notice and in accordance with the law, will be confirmed unless (a) there was fraud, unfairness or mistake in the conduct of the sale; or (b) the price brought at the sale was so grossly inadequate as to shock the conscience of the court and raise a presumption of fraud, unfairness or mistake. Mere inadequacy of price is not a sufficient ground for setting aside a judicial sale where there was no unfairness in the conduct of the sale. In determining whether gross inadequacy exists the bankruptcy court must take into consideration appraisement of the property as a guide in the exercise of its discretion in accordance the intendment of the statute cited. Where the bankruptcy court fails to confirm a judicial sale in the absence of unfairness, fraud or mistake or gross inadequacy of price, its action will be reversed on the ground of abuse of its legal discretion.

*Id.* at 318–19. Relying on the above passage, the bankruptcy court held that "the price obtained at a judicial foreclosure sale that would not be overturned under *Stanley* is 'reasonably equivalent value' under 11 U.S.C. 548(a)(2)(A)." (op. at 24.)

The bankruptcy court's reliance on *Stanley* for interpreting the application of section 548 to foreclosure sales is misplaced. *Stanley* was decided well before the enactment of the current Bankruptcy Code and, most significantly, before the 1984 amendments to the Code. Thus, *Stanley* is no longer easily applied to the situation presented in the instant matter. In *Stanley,* the Court interpreted the following section of the old Bankruptcy Act which governed the bankruptcy courts' involvement with public sales of debtor's property:

> "... Real and personal property shall, when practicable, be sold subject to the approval of the court. It shall not be sold otherwise than subject to the ap-

proval of the court for less than 75 per centum of its appraised value ..." 164 F.2d at 318, *citing*, (Section 1, 52 Stat. 879 (1938), 11 U.S.C.A. sec. 110, sub. f). This section, unlike section 548 of the Code, did not provide a specific standard for a court to apply. Instead, it gave bankruptcy courts considerable discretion to confirm or avoid the public sale of estate property. Contrary to the scheme under the Bankruptcy Act, Section 548 of the Code defines the standard which governs the avoidability of transfers; transfers must be in exchange for "reasonably equivalent value." While this standard remains subject to varying interpretations, its plain meaning cannot fairly be equated to "gross inadequacy of price" standard of *Stanley*.

Although the *Stanley* decision was based on a careful measuring of the conflicting policies behind state foreclosure sales and federal bankruptcy laws, Congress has since changed the balance of these policies. The plain meaning of the 1984 ammendments to the Code requires that foreclosure sales be viewed as transfers under section 548; thus the accompanying "reasonably equivalent value" standard must now be applied.

■ Appellee correctly notes that the Third Circuit has recently considered the interrelationship between state foreclosure sales and the Bankruptcy Code in *Matter of Roach*, 824 F.2d 1370 (3d Cir.1987). Appellee contends that *Roach* requires that the bankruptcy court and this court must refrain from affecting the finality of the non-collusive state foreclosure sale involved here. However, *Roach* is distinguishable from the instant matter. Its rationale supports rather than contradicts the conclusions reached here.

*Roach* involved an attempt by a debtor to cure a default on a home mortgage pursuant to 11 U.S.C. sec. 1322(b) after there had

been a contractual acceleration of the full mortgage debt, foreclosure judgment, and a foreclosure sale, but before the state law redemption period had expired.[6] The *Roach* court held that the debtor could not use the reorganizational powers of section 1322(b) to disrupt the finality of a foreclosure sale. The court noted that the issue pertained to "federal-state relations in the bankruptcy area." *Roach*, 824 F.2d at 1373. The *Roach* court noted further:

"Proper respect, therefore, for the independent sovreignty of the several States requires that federal supremacy be invoked only where it is clear that Congress so intended. Statutes should therefore be construed to avoid pre-emption, absent an unmistakable indication to the contrary."

824 F.2d 1373, *quoting, Penn Terra Ltd. v. Department of Environmental Resources*, 733 F.2d 267, 272 (3d Cir.1984). The section of the Code in *Roach* was at best ambiguous as to whether foreclosure sales were within its scope. In the instant matter this is not the case. The plain meaning of the language in section 548 evinces Congress' intent to include foreclosure sales under the avoidance powers of that section of the Code. Thus, *Roach* does not affect the conclusions drawn here.

## USE OF BID PRICE TO CALCULATE REASONABLE EQUIVALENT VALUE

■ The bankruptcy court erred in another respect when applying section 548 to the instant matter. The bankruptcy court declined to use the price bid by Harsanyi at the foreclosure sale as the basis for determining whether transfer was for reasonably equivalent value.

(op. at 14) The bankruptcy court noted: The court, however, feels that it is not appropriate to compare the bid price with

---

**6.** Section 1322(b) provides in part that a Chapter 13 plan may:
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence ...;
(3) provide for the curing or waiving of any default; ...

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured or secured claim on which the last payment is due after the date on which the final payment under the plan is due; ...
11 U.S.C. sec. 1322(b).

the appraised price as the bid price is a net figure. The total consideration paid by the Haranyis (sic) including sheriff's commissions and transfer taxes was $133,677.00.

*Id.* The bankruptcy court's rationale here is contrary to the provisions of section 548, which authorize avoidance "if the debtor ... received less than a reasonably equivalent value. 11 U.S.C. secs. 548(a) and 548(a)(2)(A). Thus, it is proper for the bankruptcy court to determine the amount which the debtor might have received had the property been sold under normal circumstances, but it is incorrect to determine "reasonably equivalent value" based on the amount the buyer paid, rather than the amount the debtor or its creditors received.

## BANKRUPTCY COURT'S USE OF DOCUMENTARY EVIDENCE

■ In order to determine whether a transfer of property was made for "reasonably equivalent value" under section 548, a bankruptcy court must first determine the fair market value of the property. In the instant matter, the bankruptcy court failed to hold an evidentiary hearing on this issue. Instead, its determination of fair market value and ultimately of "reasonably equivalent value," was based solely on the appraisal documents submitted by both parties. Despite having conflicting written appraisals before it, the bankruptcy court chose to discredit the appraisal by appellants' expert, while accepting the expert reports submitted by appellee, Harsanyi.

In its opinion the bankruptcy court states:

The Court is of the opinion that the [appellants'] Izenberg Appraisal is less reliable than the others submitted. The Izenberg Appraisal compares the property in question with three other properties; 80 Mill Street which sold for $228,900, 59 Washington Avenue which sold for $219,000 and 42 Sherman Place which sold for $225,000. Each of those houses were larger than debtors' and sold for an average of $135.22 per square foot of living space. The [appellee's] Pace Appraisal utilizes as comparable sales, properties that more closely approximate the size of the debtor's (sic) property and the average price of those sales is $134.46 per square foot of living space.... [T]he Court has less confidence in the Izenberg appraisal. There are two reasons. First, although his comparables average $135.22 per square foot, Izenberg's appraisal of the subject property calculates to $152.27 per square foot.... The second reason that the Court has less confidence in the Izenberg appraisal may be due to the fact that there was some urgency in its preparation. The Court notes that the Izenberg appraisal indicates that the property does not contain a fireplace when all the other appraisals indicate the property has a fireplace.

(op. at 13–14) Because the bankruptcy court disregarded appellants' Izenberg appraisal in this fashion, its conclusion as to "reasonably equivalent value" was based on the estimates submitted by appellee and not the estimate submitted by appellants.

The documentary evidence presented to the bankruptcy court contains no basis for the conclusion that an *average* of the price per square foot of comparable properties should be used to determine the fair market value of appellants' property. For example, the Izenberg appraisal notes that one of the listed "comparable" homes actually sold for $146.00 per square foot. There is no basis for assuming, absent further explication by a real estate expert, that this figure should not be used to determine the value of appellants' property, instead of the average price per square foot. Moreover, there is no basis for assuming that the higher price per square foot applied by Izenberg to appellants' property is less reliable, merely because it exceeds the average price per square foot of "comparable" homes. In fact, one of the appraisals submitted by Harsanyi did not calculate the price per square foot for comparable homes.[7]

---

7. (Report of Thomas S. Kachelriess, S.R.A.) Appellee's Kachelriess appraisal notes that a "sim-

ilar recently sold property" which is "similar in size" to appellants' property, except "superior in

It is likely that many factors enter into the estimation of real estate values. The expert appraisal reports submitted in the instant matter leave much unexplained concerning the methods used to derive such estimates and the nature of the current market. It is inappropriate for a court to apply appraisal methods which are not established by the evidence. Moreover, while the bankruptcy court might ultimately be correct in disregarding the appellants' Izenberg appraisal, the proper procedure for determining such an issue, at least where the parties have submitted conflicting documentary evidence, is to hold an evidentiary hearing. I agree with the decision of *In re Hulm,* 738 F.2d 323 (8th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984). The *Hulm* court held that "the question of whether the sale price provided a reasonably equivalent value cannot be answered without an evidentiary hearing." Thus, on remand the bankruptcy court should hold such a hearing.

### CONCLUSION

For the foregoing reasons, this case will be remanded to the bankruptcy court for proceedings consistent with this opinion. Appellants' counsel are requested to submit an appropriate order.

lot utility" and "lacking [a] second full bath," sold for $200,000.